**Sidney I. GREENE, Noel Goldblatt and Lionel Goldblatt, co-partners, doing business as Morris Fisheries Co., and Ho-Ma Packing Company, Plaintiffs-Appellees,**

v.

**Geoffrey CHEETHAM, Defendant-Appellant.**

**No. 356, Docket 26837.**

United States Court of Appeals Second Circuit.

Argued April 19, 1961.

Decided Aug. 31, 1961.

Samuel M. Sprafkin, New York City (Samuel M. Sprafkin and Mandel M. Einhorn, New York City, of counsel), for plaintiffs-appellees.

Symmers, Fish & Warner, New York City (William G. Symmers, William Warner, New York City, of counsel), for defendant-appellant.

Before WATERMAN, MOORE and SMITH, Circuit Judges.

WATERMAN, Circuit Judge.

Plaintiffs, Sidney I. Greene, Noel Goldblatt and Lionel Goldblatt, of Chicago, Illinois, copartners doing business as Morris Fisheries Co. and as HO–MA Packing Company, purchased three shipments of frozen catfish fillets from the Grimsby Frozen Products Co. (Grimsby) of Grimsby, England. The three shipments were shipped aboard three separate vessels. Grimsby insured the shipments against loss or damage. The fillets were transported by truck overland from Grimsby, England to the ports of departure. Two of the vessels, the Bassano and Marengo, departed from Hull and the third, the Media, from Liverpool. The three vessels arrived in New York harbor on August 27, 1952, September 13, 1952, and September 25, 1952. When the fillets arrived they were warehoused at the Harborside Warehouse in Jersey City, N. J. There was evidence to the effect that in October 1952, two prospective buyers refused to purchase the fish, and that then the plaintiffs discovered that some of the fillets were probably unfit for sale. On November 6 and November 8, 1952, plaintiffs transferred the fish to the Riverside Warehouse in Tiverton, R. I., where, on February 4, 1953, the Food and Drug Administration began an examination that resulted, on February 26, 1953, in the condemnation of the fish as unfit for human consumption. During this period, between February 4 and February 26, the plaintiffs notified the insurance underwriters of the action of the FDA. This was the first notice of the condition of the fish that was given the underwriters. They denied liability.

Thereupon plaintiffs sued in the United States District Court for the Southern District of New York and recovered judgment against defendant Geoffrey Cheetham, as the representative of Grimsby's insurance underwriters, for the loss plaintiffs incurred as a result of the condemnation. Defendant appeals.

We are of the opinion that the court below erred in its construction of the insurance contract involved here, and that this error precluded the taking of evidence that in our judgment is essential to the just disposition of the controversy. Consequently we reverse the judgment below and remand the case for a new trial.

I

The underwriters issued two floating cover policies to the shipper, Grimsby, which provided coverage for frozen fish shipments to be made by Grimsby, as follows:

"From any port or ports and/or place or places in the United Kingdom (including risk from warehouse in interior of the United Kingdom if required) to any port or ports and/or place or places in the

World. Via any route and including transhipment if required.

\* \* \* \* \* \*

"On:—Frozen Fish \* \* \*"

These are typical open-cover policies similar to those which this court only recently construed in Hamdi & Ibrahim Mango Co., Ltd. v. Reliance Insurance Co., 2 Cir., 1961, 291 F.2d 437. The assured binds the insurer by issuing a certificate of insurance for each specific shipment and inserting therein the valuation of the shipment, the name of the vessel, and the route for which coverage is to be had. The certificate is negotiable and normally is transferred to the consignee or purchaser. A copy of the certificate is forwarded to the underwriter, who then computes the premium based on the coverage desired. In computing the premium the insurer takes into consideration the nature of the goods shipped, their declared valuation, the method, route, and estimated length of time of transportation, whether warehousing as well as port-to-port transportation is to be covered, and other relevant factors. This procedure facilitates the use of insurance by businesses concerned with the transportation of goods and is a vast improvement over separate-shipment insurance.

In this case Grimsby executed three certificates of insurance under its open coverage policies to cover the three shipments. Loss, if any, was to be payable to the plaintiffs herein, the purchasers of the shipments. This made the entire open coverage policies applicable to the shipments but applicable only to the extent embraced within a reasonable interpretation of the insured's intent as found from the language it used in the certificates. See Industrial Waxes v. Brown, 2 Cir., 1958, 258 F.2d 800, 802, certiorari denied, 1959, 358 U.S. 931, 79 S.Ct. 319, 3 L.Ed.2d 304. The certificates contained a broad reference to coverage, similar to that set out in the main policy quoted above, as follows:

"\* \* \* from *warehouse* at any port or ports, place of places in the *United Kingdom* to *warehouse* at any port or ports, place or places in *the World*."

However, in the place left for the assured's declaration of coverage the assured inserted from "Hull" to "Chicago via New York" for two of the shipments and from "Liverpool" to "Chicago via New York" for the third.[1] Therefore, if the more restricted statement of coverage made in each declaration of coverage is to control, it follows that the overland transportation leg, the leg from Grimsby, England to the English ports, was not covered.[2]

The crucial question in this case is whether the language of the main policy or the language chosen by the assured for insertion in the certificates defines the extent of the coverage against loss, for the parties stipulated at the trial that there was no change in the condition of the fish after the fish were stowed on board ship at the English seaports until

---

1. The Media certificate is typical of the three in suit. It reads as follows:
   "£5970 Stg.
   We hereby declare for Insurance under the said Cover Five thousand, nine hundred & seventy Pounds sterling on interest as specified hereon so
   valued per       'Media'
   at and from       Liverpool
   to       Chicago via New York
   subject to the terms of the Standard Form of Lloyd's Marine Policy and to the special conditions stated below and on the back hereof.

   This Certificate not valid unless the Declaration be signed by
   Grimsby Frozen Products, Ltd.
   Signed S. Heath
   Dated at Grimsby, 6th September 1952"
   \* Underlining indicates handwritten insertions.

2. The Bassano fish arrived at Hull on August 15 and 16, 1952. The Bassano certificate is dated August 18, 1952. The Media fish arrived at Liverpool on September 3, 1952. The Media certificate is dated September 6, 1952. The Marengo fish arrived at Hull on September 12, 1952. The Marengo certificate is dated September 15, 1952.

they were condemned at Tiverton, Rhode Island. The court below construed the insurance contract to cover the overland leg and discovered no ambiguity between the general coverage clause in the main policy and the specific declaration of coverage in the certificates.[3] However, we do not find the problem as clear cut as the trial court found it. We think that, in such a conflict, ordinarily the more specific declaration of coverage would be binding instead of the all-inclusive provisions of the policy, and think it so particularly when, as here, the assured may delineate the extent of his own coverage. See Hamdi & Ibrahim Mango Co., Ltd. v. Reliance Insurance Co., 2 Cir., 1961, 291 F.2d 437; Industrial Waxes v. Brown, 2 Cir., 1958, 258 F.2d 800, 802, certiorari denied 1959, 358 U.S. 931, 79 S.Ct. 319, 3 L.Ed.2d 304. Here we are not dealing with an assured who has been misled because of an unequal bargaining position.

■ Nevertheless, despite our approach to the problem, it does seem strange to us that Grimsby would only provide that its shipments be covered from the ports of embarkation to inland destination points in the United States and would not cover the relatively short inland transportation from the point of origin, its own warehouse, to shipside. Hence it is frustrating indeed to search the record made below and find that the parties were discouraged from offering extrinsic evidence of purpose and intent that would help to clarify this problem—a problem the trial judge found it so unnecessary to solve that the little testimony in the record concerning it was not evaluated by him, and no findings of fact with reference thereto were found.

## II

The open policy provides:

"This insurance is against All and Every Risk whatsoever, howsoever arising irrespective of percentage.

Including loss and/or deterioration of fish as a result of delay of vessel and/or conveyances for reasons beyond the control of the Assured irrespective of percentage.

Including risks of condemnation by the Authorities under Pure Food Laws irrespective of percentage.

Including claims as a result of breakdown of refrigeration equipment and defrosting of fish from any cause whatsoever irrespective of percentage.

  *   *   *   *   * "

The court below interpreted this language to mean that inasmuch as one of the risks contracted specifically to be covered, the risk of condemnation, had occurred, the plaintiffs were entitled to recover on the insurance contract irrespective of whether the condition of the fish which caused the condemnation had existed prior to the time when the insurance was effective; that is, had existed prior to the first leg of the transportation that the parties had contracted to insure. Defendant claims that if this unfit condition had existed prior to the time the insurance coverage attached the fish never were covered, for the assured on pain of having the policy avoided must disclose to the insurer all facts pertinent to the risks that the assured ought to know about. Defendant also relies on a clause in the open policy which excluded coverage for loss or damage resulting from inherent vice of the subject-matter insured. The court below took the position that this "inherent vice" clause was rendered inoperative by the "All and Every Risk" clause. We are of the opinion that this was a mistaken interpretation and that within the same policy both clauses may be given full effect.

■ There is no inconsistency between a clause providing for a recovery for loss arising from "all and every risk" and a clause that precludes a recovery for loss caused by inherent vice in the goods. The underwriters may well have intended to cover all risks of loss arising from any event occurring while the insurance was in force. But the "all-risk" event so

---

3. See Stenographic Minutes of hearing, pp. 231–242.

covered would not include an undisclosed event that existed prior to coverage, or an event caused by the consummation during the period of coverage of an indwelling fault in the goods that had existed prior to that coverage. Otherwise the underwriters are in the position of either having to pay for undisclosed loss or damage actually caused prior to the time of coverage or uncontemplated loss or damage caused from deteriorating agents present within the goods when the goods were shipped.

Appellee argues that inasmuch as the event of condemnation was a specific event for the occurrence of which the insurer undertook the risk of loss, the condemnation after the insurance contract was entered into made the insurer liable on the policy irrespective of the condition of the fish when first shipped, or during transportation, or at the time the certificates of coverage were issued by the shipper. If this were a correct interpretation of the contract, the underwriters, despite the inherent vice clause, knowingly accepted a risk of loss caused by a possible pre-existing vice in the goods, and also agreed to be bound even if the insured had failed to disclose material facts. This seems to us to be an unreasonable interpretation. Fish designed for human consumption, if unfit for consumption when shipped, would inevitably be condemned. Hence there would be no insurable risk of loss but a certainty of loss. To hold otherwise would be to impose upon the insurer a guaranty of the good quality of the fish as and when packed by the shipper, which liability under the policy the insurer had not assumed. It makes sense to construe the contract so as not to cover the fish if they were bad when the insurance attached.[4] We so construe it.

The court below made no findings as to when the fish became unfit for human consumption. Such a finding was unnecessary in view of its interpretation of the contract. It adopted the plaintiff's proposed findings of fact; and, having found as the parties stipulated should be found, that there had been no change in the condition of the fish from the time they had been stowed aboard the ships until their condemnation, gave judgment against the insurer. No finding was made as to whether the fish were bad at Grimsby, or became bad on the initial overland carriage to the ships. The only finding bearing upon this issue was the one the parties stipulated to—that the condition of the fish remained unchanged from stowage to condemnation. In fact little evidence on this point was introduced. There were answers to written interrogatories taken in England by one of Grimsby's owners. He declared that the fish were "in perfect condition, to the best of my knowledge," and he also declared that no change would have occurred on the overland leg. Acceptance in toto of this position would result in a finding that the fillets never went bad prior to the sea voyage, but were perfect when shipped (and despite the stipulation that this couldn't be so), their condition worsened during the voyage, and they were bad when they arrived at New York. The defendant produced an expert who testified that the fillets couldn't have gone bad during the overland leg if packed as plaintiffs claimed they were. There was no further evidence and the court did not resolve the conflicting inferences. Therefore, on our theory of the case, we must remand to the district court so that it may take evidence and make appropriate findings determining whether the fish were bad when shipped or went bad during the English overland transportation.

### III

Defendant also relies upon the alleged failure of the plaintiffs to give

---

4. Of course the amount of the premium paid by the insured could shed light on the parties' intent. But evidence on this point is lacking in the record and would appear to have been precluded by the court's interpretation of the parties' contract.

the notice of impending loss required by the policy. On the face of each of the three certificates this legend appears: "In case of Goods arriving damaged immediate notice must be given to the Lloyd's Agent authorized to settle claims under this Certificate in order that he may survey them." On the reverse side of each of the certificates the following appears:

> "Note.—It is necessary for the Assured to give prompt notice to Underwriters when he becomes aware of an event for which he is 'held covered' under this insurance and the right to such cover is dependent on compliance with this obligation."

It is undisputed that plaintiffs gave timely notice of the condemnation, and plaintiffs maintain this notice was all that was required of them. However, defendant claims that plaintiffs became aware of damage to the goods, and possible total loss thereof, some four months prior to the resulting condemnation, and that he was entitled to notice thereof at that time.

No necessary inconsistency exists between the two clauses. The underwriters could reasonably require that they be notified of damage so as to enable them to take action to limit their prospective loss, and, also, could reasonably require that they be further notified when some "held covered" event occurred, such as condemnation.

The lower court made no findings with respect to whether the plaintiffs in October 1952 had knowledge of the damage; whether the damage was such that the clause quoted above required notice; or whether the notice given in February 1953 reasonably satisfied all the policy requirements set forth on the certificates. Upon remand, if the district court finds that the shipments were covered, there should be a resolution of the issues the defendant raises that have reference to these notice provisions.

Reversed and remanded for further proceedings not inconsistent with the opinion herein.