The ESSEX HOUSE and Louis
Lerner, Plaintiffs,

v.

ST. PAUL FIRE & MARINE IN-
SURANCE COMPANY,
Defendant.

No. 6488.

United States District Court,
S. D. Ohio, W. D.

Findings of Fact and Conclusions of Law
on Issue of Damages
Jan. 18, 1973.
May 13, 1975.

Douglas G. Cole, Goldman, Cole & Putnick, Cincinnati, Ohio, for plaintiffs.

James L. O'Connell, Lindhorst & Dreidame, Cincinnati, Ohio, for defendant.

DAVID S. PORTER, District Judge.

This is a diversity case (28 U.S.C. § 1332) in which plaintiffs seek a declaratory judgment under 28 U.S.C. § 2201, to determine their rights under an "ALL–RISK" insurance policy issued by defendant to them for the period from July 25, 1965 to July 25, 1968, by reason of an occurrence on July 4, 1966. On that day there was a brick failure on plaintiffs' seven-story apartment building known as "The Essex House." A considerable portion of the face brick on the insured building detached from the back-up block and either fell to the ground or was thereafter removed.

By prior order of this Court, this cause came on for hearing on February 18, 1972, on the following issues only:

(1) The cause or causes of the loss suffered by plaintiffs by the occurrence of July 4, 1966.

(2) Whether such cause or causes of loss were covered or excluded from coverage under the provisions of Policy No. 666 NB 3959.

(3) The sufficiency of the notice and proof of loss.

The parties presented their respective proof on the above issues by way of a joint stipulation; the introduction of exhibits, consisting of photographs, plans and specifications, and other documents pertaining to the construction of this building; local Climatological data from the United States Weather Bureau; the deposition of Alvin Lipson, the original architect; and the testimony of three expert witnesses. After consideration, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The Essex House is an Ohio partnership which has filed with the Clerk of the Common Pleas Court of Hamilton County a certificate of partnership stating in full the names and places of residence of the members of the partnership.

2. As of July 4, 1966, Louis Lerner and The Essex House, a partnership, owned the building known as "The Essex House," as tenants in common. The building was completed and partly occupied on or before January 1, 1965, so it was in its second summer when the accident occurred.

3. On July 4, 1966 there was in full force and effect a certain policy of insurance No. 666 NB 3959 issued by the defendant to the plaintiffs on July 25, 1965, for a three-year term expiring on July 25, 1968, covering the structure in question. For the purposes of the within action, the pertinent portions of the said insurance policy were those which provided as follows:

## BUILDING(S)
## ALL RISK COVERAGE

Subject to the provisions herein and of this Policy, such insurance as is

afforded under coverage C of Section II is extended to insure against all risks of direct physical loss or damage, except as excluded or limited herein.

EXCLUSIONS AND LIMITATIONS

1. This Company shall not be liable, under this rider, for loss caused by a peril which is otherwise insured against under Section II of this policy.

2. The "EXCLUSIONS" of Section II are applicable to this rider.

3. The following additional exclusions and limitations apply:

A. This rider does not insure against loss caused by:

   (1) Wear and tear, deterioration, rust or corrosion, mould, wet or dry rot; inherent or latent defect; smog, smoke, vapor or gas from agricultural or industrial operations; mechanical breakdown, including rupture or bursting caused by centrifugal force; settling, cracking, shrinkage, bulging or expansion of pavements, foundations, walls, floors, roofs or ceilings, animals, birds, vermin, termites or insects; unless loss by a peril not excluded ensues and then this company shall be liable for only such ensuing loss.

\* \* \* \* \*

'17. LOSS REPORTING AND ADJUSTMENTS (a) The Insured shall as soon as practicable report to this Company or its agent every loss or damage which may become a claim under this Policy and shall also file with the Company or its agent within ninety (90) days from the date of loss a detailed sworn proof of loss. Failure by the Insured to report the said loss or damage and to file such sworn proof of loss as hereinbefore provided shall invalidate any claim under this Policy for such loss.'

4. At or about 9:00 A.M. on July 4, 1966, an area of the brick facing detached from the building and fell to the parking lot below. Additional areas of such brick facing detached, wholly or partially, did not immediately fall, but were subsequently removed by or at the direction of plaintiffs. The plaintiffs discovered the aforesaid occurrence on July 4, 1966.

5. Subsequent to July 4, 1966, the following exchange of correspondence, all in in evidence, took place regarding the notice and proof of loss.

(A) A letter dated September 29, 1966, from counsel for the plaintiffs to the defendant with an attachment entitled "Sworn Statement in Proof of Loss".

(B) A letter dated September 29, 1966, from counsel for the plaintiffs to counsel for the defendant.

(C) A letter from counsel for the defendant to counsel for the plaintiffs dated October 17, 1966.

(D) A letter dated October 31, 1966, from counsel for the plaintiffs to counsel for the defendant.

(E) A letter under date of November 22, 1966, from counsel for the defendant to the plaintiffs, and a letter under date of November 25, 1966 from defendant to plaintiff.

(F) A letter entitled "Supplement to Proof of Loss" dated August 10, 1967, from the plaintiffs to the defendant.

(G) A letter from counsel for the defendant to the plaintiffs, dated August 18, 1967.

(H) First Notice of Claim of Loss dated July 5, 1966.

(I) Letter dated February 7, 1967, from W. A. Mossberg, Regional Superintendent of defendant, to Robert B. Barnett, of Isaacs and Bernstein.

6. A number of things need to be noted as to the conditions which existed

in "The Essex House" on July 4, 1966. They are as follows:

(A) The concrete block backup walls were overstressed because of the manner in which window openings were located, a condition visible and apparent upon examination.

(B) There were no control joints in the masonry walls, a condition visible and apparent upon examination.

(C) Part of the exterior brick facing rested upon steel ledge angles, while the remainder rested upon concrete beams, a condition visible and apparent upon examination.

(D) In the course of the construction of the brick exterior wall, one alternative header course was installed on sixteen inch centers horizontally followed by five stretcher courses vertically, followed by another alternative header course, an unauthorized change from the bonding pattern called for in the plans. The plans provided for continuous headers every seventh course. This change resulted in the brick facing wall having only 30% of the headers called for under the plans, which caused the remaining headers to be greatly overstressed, a condition visible and apparent upon examination.

(E) The bolts supporting the ledge angles were changed from $\frac{3}{4}$th inch to $\frac{5}{8}$ths inch diameter. Certain bolts fastening the ledge angle to the concrete beam were installed by welding steel washers, shims or nuts to the ledge angles. Certain other shims were placed between the concrete beam and the ledge angle at distances up to six inches away from the bolt. Certain holes in the ledge angles were enlarged or recut to permit the bolts to be attached to the concrete beams. The spacing of the steel ledge angles to the concrete beams ranged from flush to $\frac{1}{2}$ inch. All of such changes resulted in weakening the connection of this shelf angle to the concrete beam. Such condition was discoverable during construction.

(F) As to the condition of the masonry, in some instances there were voids between the backup wall and the face brick and in the joints of the backup block. In other instances block was laid up out of plumb, and in still others mortar was used to fill voids in the backup wall in lieu of concrete block; all of which contributed to the overstressing of the backup block wall. Such condition was discoverable during construction.

(G) The above structural conditions were in existence on and prior to July 25, 1965.

(H) The parties stipulated that if the partners of the plaintiff partnership and Louis Lerner, or their representatives and agents were called, they would testify that they had no knowledge of the existence of the foregoing structural conditions on or prior to July 25, 1965, or prior to July 4, 1966. If the representatives of the defendant were called, they would also testify that they had no knowledge of the existence of such structural conditions on or prior to July 25, 1965, or prior to July 4, 1966.

(I) The rates of expansion and contraction of the face brick outside wall and the concrete backup wall were not the same. On July 4, 1966, the temperatures of the two walls were not the same, the brick wall being outside and subject to thermal expansion because during each of the preceding fourteen days the outside temperature was in excess of 88 degrees, while the concrete backup wall was inside where air-conditioning (a part of the design of the building) chilled the interior temperature. Additionally, one of the natural structural properties of the backup concrete block is its capacity to creep or shrink as the result of age, both vertically and horizontally.

(J) The effect of these high outside temperatures on the outside brick wall would be its thermal expansion. The effect of a cooler tem-

perature on the inside concrete back-up wall, together with the creep property of such block, would be to cause it to remain either relatively stable, or to contract slightly.

(K) By reason of such extremes of temperature, an external cause, between the outer face brick wall and the inner backup block wall, a differential movement of about one-fourth of an inch was caused between said walls, which placed additional stress on the headers which tied the two walls together, so overstressing such headers, which themselves were perfectly sound and adequate, that they were caused to break, which then caused the brick face wall to detach from the building and fall on July 4, 1966.

At this point it is well to summarize the testimony of the experts on the cause of the collapse, since such cause is one of the two main issues in the case, the other being whether the collapse is covered by the policy.

The plaintiffs offered Russell Fling, a zoning engineer, with excellent qualifications, to give an opinion on causation. Besides being experienced as a consulting engineer and active in professional societies, including the American Concrete Society, he investigates from 10 to 15 brickwork failures a year. In connection with his qualifications he was questioned about a number of these.

In this case he was retained four days after the collapse which occurred July 4, 1966. He visited the site, looked over the building, heard what people had to say and checked the plans, preparatory to forming an opinion as to the causation and what to do in the way of remedial measures.

As to the cause, when asked what caused the collapse, Mr Fling said there were two problems, one being that the brick facing fell off the building, and the other that the backup of the bearing wall was overstressed (15, 16). Hence some remedial measures had to be taken in addition to repairing the collapse of the brickwork. Thus there were "two separate and almost unrelated problems but not quite fully unrelated" (16).

The overstressing of the backup bearing wall was due to the misplacement of windows (16).

Such overstressing condition of the backup wall was tied in with the brick facing (19), and such facing brick was therefore also overstressed, because the two were tied together by headers and the wall acts as a unit. (See JX U-1)

Mr. Fling explained why the brick fell off, how the stress load from the beams is shared by the brick facing and the block (20). The brick facing rested on steel shelf angle (23) and the shelf angle allowed the brick to move downward a trifle relative to the blocks (24). He said there were not enough headers (24); there were only 29% or less of the number called for by the plans (29), and this is shown by the photograph and was visible from the outside.

Mr. Fling explained that the concrete wall shrinks one-fourth of an inch or fourteen hundredths of an inch as the result of "creep" (28), and this put additional stress on the headers which tied the block and brick wall together. Besides the header deficiency, poor workmanship accounted for the collapse. In this connection he said bricks were placed at off angles; there were occasional voids in the blocks (see photograph which is JX R-8).

Then there were instances where no mortar was placed and this is shown in the photograph which is marked JX-R-6 (32).

More evidence of poor workmanship is apparent in the photograph which is JX-R-12, which shows that inserts were not put in the proper place to connect the shelf angle (34). The shelf angle has holes for the inserts in certain places, and whoever did the work calculated wrong and had the bolts coming out at the wrong places, so there had to be cuts which weakened the shelf angle. In addition they used the wrong size

bolts—⅝ths instead of ¾ths, and these were at least one-third weaker than the ¾ths, and this put more stress on the headers and weakened the shelf angles.

There was still other evidence of poor workmanship in that shims were poorly constructed and not installed all the way to the bolt of the angle and therefore not as effective as they should have been (38). They were installed to fill the space around the bolts which connect the shelf angle to the building. In some instances these bolts were placed at the top of the shelf angle, making less metal available to carry the stress. An example of this is shown in the photograph which is JX–R–13 and the one which is JX–R–12 (39).

Additional examples of poor workmanship are detailed on plaintiff's exhibit U–4 (40). This shows the defect in the backup wall where the blocks were not staggered. It also shows no mortar in the head joint in the photograph which is JX–R–8.

As shown in Note 2, on PX U–4, there were small openings which indicate blocks were carelessly placed in wet mortar without tamping to insure a full mortar bed. And the effect of this deficiency was to reduce the load-carrying capacity of the wall, since no load can be carried across an open joint.

The first note showed that some of the header joints had no mortar between them. In other places, as indicated above, vertical joints were aligned for several courses instead of being staggered.

As stated in Note 4, the steel bars and bar beams were frequently not completely imbedded in concrete, and this was poor workmanship.

And lastly, as shown in Note 5 on JX–U–4, the walls were not plumb, and this is shown in the photograph which is R–10, which shows that blocks overlapped the ones underneath them.

Mr. Fling said all these deficiencies made more load on the wall and the headers than they could bear and caused the collapse. A large factor in the collapse was the failure to put in the specified number of headers—less than 29% of the amount called for by the specifications.

To recapitulate, the witness testified there were a number of causes of the collapse (45, et seq.):

(1) the load transferred from misplaced windows put stress on headers;

(2) there were not enough headers;

(3) there were no vertical expansion joints;

(4) the blocks shrank naturally as the result of "creep" and this put pressure on the headers;

(5) there was poor workmanship in that there were voids in block placements and bricks were placed at angles;

(6) there was an absence of mortar at the end of some blocks on which the header was resting, changing the fulcrum and leading to breaks in the headers inside the surface wall;

(7) the shelf angle had deficiencies or at least the bolts which protruded from the inserts in the wall which were supposed to fit into holes in the shelf angle were misplaced;

(8) bolts used were smaller than they were supposed to be—⅝ths instead of ¾ths inches;

(9) as a result of misplacement, holes had to be bored near the top of the shelf angle, leaving an insufficient amount of metal to carry the load;

(10) shims were not placed all the way down to where the bolts went into the holes in the shelf angle;

(11) the causes covered in Notes on JX–U–4.

The witness was understood to say in general that the collapse resulted from deficiencies in the building and normal expansion and those elements started to operate as soon as installed and the building was occupied.

The important thing is that Mr. Fling said that in looking back he could not say it was bound to happen, though he could say the forces would have an adverse effect. "If I'd known what I know now about it [the building], I could not predict when it would fail or even whether it would actually fail and have the brick fall off. I just don't know" (r. 54).

The defense witnesses were William H. McConnell and Woodward Garber. While McConnell, a consulting engineer, said the collapse was inevitable, Garber, a licensed architect, said at one point the loss was inevitable, but, at another point, he said that somewhere in the life of the building the combination of causes would have caused the collapse, but it could not be predicted when.

Both McConnell and Garber testified that some causes could have been detected after the erection of the building, and those, together with ones not detectable, caused the collapse. Mr. Garber testified:

"Q. But one couldn't say whether such a failure would occur, just sometime during the life of the building it would occur. Is that correct?

"A. I would say so, yes (r. 72).

\*    \*    \*    \*    \*    \*

"Q. In this case it happened to occur when it did. But if you knew all the facts ahead of time you couldn't have predicted it? It could have been sooner or it could have been later? Is that right, sir?

"A. I would say so (r. 72)."

7. It is in the light of this testimony, and because we have considered the opinion of the plaintiffs' expert entitled to special weight, because of his qualifications and experience in brick failures, that we find as a fact that the brick failure in this case was due to poor workmanship and natural causes, and, more importantly, that though some of the causes, e. g., the deficiency in the number of headers, could be detected by observation, others could not. This is why we find that while one can say now by the exercise of hindsight that the forces which caused the collapse or some of them went to work right away, it could not be predicted then when the wall would fall or if it would fall and specifically not whether it would fall during the term of the policy.

## CONCLUSIONS OF LAW

1. The plaintiffs did give the defendant adequate and sufficient notice and proof of loss within the provisions of the policy.

2. The insurance policy, which covered "ALL RISK[S]" of physical loss, created a special broadened form of coverage which extended to every conceivable loss or damage, unless specifically excluded.

3. So far as the parties were concerned at the time the policy was issued, any loss to the building during the term of the policy would be dependent upon chance, and was a fortuitous event covered by the provisions of the "All Risk" policy.

4. The provision which excluded loss caused by inherent or latent defect does not exclude fortuitous loss. It does not exclude loss caused by negligence and does not limit loss to that caused solely by external causes.

5. The exclusion contained in 3.A of the policy, which provided that it should not apply to loss caused by inherent or latent defect, unless loss by a peril not excluded ensues, does not apply to bar recovery in this case, and the loss comes within the exception to the exclusion and is a loss by a peril not excluded under the policy.

6. Where a policy expressly insures against direct loss and damage by one element but excludes loss or damage caused by another element, the coverage extends to the loss even though the excluded element is a contributory cause.

7. The loss resulted from temperature differentials coupled with negligence in design and construction of the building in several respects, including the placement of the windows, the departure from the bonding pattern called

for in the plans, the use of undersized bolts supporting the ledge angles and placement of the holes in such ledge angles as well as in the masonry itself; the loss caused was an unforeseeable risk of physical loss, as that phrase is employed under the all-risk provisions of the policy and the coverage of the policy does extend to such loss.

## DISCUSSION

This is a diversity action. Hence, Ohio law is controlling. *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938). As to the precise issue of coverage in this case, however, we have not found or been cited to any Ohio cases. Hence our task is to choose the rule we believe the Ohio court is likely to adopt. Wright, Law of Federal Courts, p. 240. In that connection, we conclude Ohio would look to the cases we discuss, especially the one decided by the Court of Appeals for the Sixth Circuit, *General American Transportation Co. v. Sun Insurance Office, Ltd.*, 369 F.2d 906 (1969), aff'g 239 F.Supp. 844 (E.D.Tenn., 1965). Before discussing that and other pertinent cases, we note certain general principles.

"It is axiomatic that an insurance policy prepared by the insurer must be liberally construed in favor of the insured. Any ambiguity must be resolved against the insurer. *Yeager v. Pacific Mut. Life Ins. Co.*, 166 Ohio St. 71, 139 N.E.2d 48 (1956). Nevertheless, this rule of construction should not be implied to provide an unreasonable forced interpretation of the words of the policy. *Morfoot v. Stake*, 174 Ohio St. 506, 190 N.E.2d 573 (1963). The court must adopt the construction which most nearly corresponds with the intention of the parties as ascertained from the words employed by them in their plain, ordinary, and usual meaning. *Portaro v. American Guar. & Liab. Ins. Co.*, 210 F.Supp. 411 (N.D.Ohio 1962)." *Bright v. Ohio Cas. Ins. Co.*, 444 F.2d 1341, 1343 (6 Cir., 1971), an appeal

from the District Court for Northern District of Ohio.

"In the absence of a manifested intent to the contrary, words in contracts are ascribed their plain and ordinary meaning. *Farmers National Bank v. Delaware Insurance Company*, 83 Ohio St. 309, 337, 94 N.E.2d 834 (1911)." *Great Am. Ins. v. Merchants & Mfr's. Mut. Ins.*, 423 F.2d 1143, 1145 (6 Cir., 1970).

"Any reasonable interpretation of the policy resulting in coverage of the insured must be adopted by the trial court in Ohio. See, e. g., *Butche v. Ohio Ca .alty Insurance Company*, 174 Ohio St. ¡44, 187 N.E.2d 20 (1962); *Home Indemnity Company v. Village of Plymouth*, 146 Ohio St. 96, 64 N.E.2d 248 (1945); *Great American Mutual Indemnity Company v. Jones;* 111 Ohio St. 84, 144 N.E. 596 (1924)." *Ollier v. Continental Casualty Co.*, 441 F.2d 792, 795 (6 Cir., 1971).

"In those instances where the wording of an insurance contract is doubtful or ambiguous, the contract is construed in a manner most favorable to the insured. The basis of this rule is that the insurer—who formulates the insurance contract and proffers it to the insured for the ostensible benefit of the insured in the event of a loss —is responsible for the language employed. Furthermore, the purpose of the contract being to provide coverage, an interpretation of doubtful terms which construes the language to provide such coverage tends to effectuate the presumed good faith intent of the contracting parties. *Munchick v. Fidelity & Casualty Co. of N. Y.*, 2 Ohio St.2d 303, 209 N.E.2d 167 (1965), and *Peterson v. Nationwide Mutual Ins. Co.*, 175 Ohio St. 551, 197 N.E.2d 194 (1964). See also *Chavers v. St. Paul Fire & Marine Ins. Co.*, 295 F.2d 812 (6th Cir. 1961)." *Burdett Oxygen Co. v. Employers Surplus Lines Ins. Co.*, 419 F.2d 247, 248–49 (6 Cir., 1969).

See also the following cases cited in the footnote (p. 321) in *Farmers Chem.*

*Assn. v. Maryland Cas. Co.*, 421 F.2d 319 (6 Cir., 1970), as examples of cases in line with well-established principles: *Space Conditioning, Inc. v. Insurance Co. of America*, 419 F.2d 836 (6 Cir., 1970); *Fidelity & Deposit Co. v. Friedlander*, 101 F.2d 106 (6 Cir., 1939); *American Central Life Ins. Co. v. American Trust Company*, 5 F.2d 71 (6 Cir.), cert. den., 269 U.S. 559, 46 S.Ct. 20, 70 L.Ed. 411 (1925); *American Casualty Co. v. Cutshall*, 205 Tenn. 234, 326 S.W.2d 443 (1959); *Alvis v. Mutual Benefit Health & Accident Assoc.*, 201 Tenn. 198, 297 S.W.2d 643 (1956). And see *Toms v. Hartford Fire Ins. Co.*, 146 Ohio St. 39, 63 N.E.2d 909 (1945). This brings us to a consideration of the second main issue—does the "ALL RISK" policy herein cover the brick failure?

The label, "all risk" as applied to policies of the type exemplified in this case has been called a "misnomer." Friendly, J., sitting by designation, *Aetna Casualty & Surety Co. v. Yates*, 344 F.2d 939 (5 Cir., 1965). It has been said, however, that the purpose of such policies is to extend coverage to risks that are not ordinarily included in other types of insurance coverage; and that under all-risk policies, recovery is allowed for all fortuitous losses unless the policy contains an express provision excluding the loss from coverage. 13 Couch on Insurance 2d, § 48:138, p. 596. Therefore, plaintiffs' argument in this connection that "all risk" is a deceptive term because plaintiff thought that by purchasing it he was thereby insured against literally *all* risks, while perhaps appealing from a layman's point of view, must be rejected. The term is one of insurance art and has been judicially recognized and dealt with as such. See, *e. g.*, *Aetna Casualty & Surety Co. v. Yates*, *supra*.

In support of their contention that the loss was a risk insured against and not expressly excluded from the policy's coverage, plaintiffs maintain that there were at least three contributing causes that were covered by the policy, and that all were readiy ascertainable by defendant in advance of issuing the policy. The three are: (1) negligent deviation from construction plans by providing less than 30% of the headers in the face brick than the plans called for; (2) errors in design in placement of window openings having the effect of overstressing the walls; (3) relative movement of the two walls due to outside heat and inside air-conditioning. Plaintiffs also argue that the loss was not inevitable or certain, and that, even if the eventual demise of the building were assured, no one could have predicted that the face brick would have fallen within the three-year term of the policy. Finally, plaintiffs argue that negligent design and construction do not relieve the defendant of liability.

The defendant's argument is essentially that the deficient factors were incorporated into and began to work upon The Essex House from its inception, and were such as to constitute an "inherent or latent defect" within the meaning of the exclusion. The defendant asserts that the building was "doomed from the start," and that it was inevitable that the face brick would collapse.

Since defendant does not dispute the fact that the collapse was attributable primarily, though not solely, to design and construction factors, the precise issue becomes whether the parties intended to exclude coverage for loss resulting from faulty design and negligent construction and whether this is accomplished by the term "inherent or latent defect" in the exclusion rider. For the reasons set forth below, we conclude that the answers to both questions should be in the negative, and the insurer should stand liable for the loss.

Plaintiffs principally rely upon three cases: *Millers Mutual Fire Insurance Co. v. Murrell*, 362 S.W.2d 868 (Tex.Civ. App., 1962); *Employers Casualty Co. v. Holm*, 393 S.W.2d 363 (Tex.Civ.App., 1965); and *General American Transportation Co. v. Sun Insurance Office, Ltd.*, 369 F.2d 906 (6 Cir., 1969), aff'g

239 F.Supp. 844 (E.D.Tenn., 1965). The facts of each are set forth and commented upon below.

In *Murrell*, the insureds alleged damage to their house when the earth beneath the house swelled and expanded causing the walls, floors, ceilings and foundation to buckle and partially collapse. A jury found that there was "earth movement" under the house during 1960 and that the earth movement was a proximate cause of the damage to the house. It further found that the damage sustained directly resulted in a "partial collapse" of the house.

The policy insured against all risks of physical loss except "settling, shrinkage, expansion in foundation walls, floors, or ceilings." There was an exception to this exclusion, however, in the case of loss by "landslide, total or partial collapse."

The Court held that the loss involved was covered by the policy:

"If the earth movement found by the jury amounted to a landslide, the damage resulting therefrom was expressly taken out of the exclusion; if the earth movement was not a landslide, it never was in the exclusion." 362 S.W.2d at 869.

The Court felt that its opinion was strengthened by a consideration of the other policy exclusion of loss to retaining walls not a part of a building "when such loss is caused by landslide, water pressure, or earth movement." The insurer having expressly excluded loss caused by earth movement to retaining walls not part of a building, the Court stated that loss to the building by earth movement was not excluded.

The insurance company argued that the earth movement which caused the damage was not a "risk" because it was not fortuitous but inevitable. It argued that it was certain from the day the house was built that this damage would happen and that there was therefore no "risk."

The Court disagreed and could find no error in the trial court's refusal to ask the jury whether the damage sued for was inevitable in the sense that the peril was not a risk but a certainty that could not be insured against. And this despite the fact that all the experts who testified after having examined the soil underlying the insureds' house said that damage similar to that which occurred was inevitable.

The facts of *Murrell* are different from those of the case at hand, the most significant difference being that there was no "inherent or latent defect" question at issue. Its value to plaintiffs, however, is to show that the effect of a comprehensive "all-risk" type of policy is generally to broaden the coverage and to demonstrate that exceptions and words of limitation are construed against the insurer. The courts will not write a limitation into a policy where none exists. It also shows how narrowly the courts tend to interpret the concept of "inevitability."

*Holm* is claimed by both plaintiffs and defendant as supportive of their respective positions. And, in fact, the case does have something to offer both sides, which makes its net impact somewhat difficult to assess. On balance, however, it would appear to be better suited to plaintiff Essex House's case rather than defendant's. A homeowner sued his insurer under an all-risk policy for damage to wood floors caused by water which resulted from defective construction in insured's house of a shower stall without a shower pan. The policy excluded "loss caused by inherent vice . . . rot" but had a provision which allowed recovery for "ensuing loss caused by . . . water damage." Since this case is cited by plaintiffs it would be natural to assume that it would shed some light favorable to plaintiffs on what is meant by "inherent vice." But such is not the case. One of the stipulations of the parties in *Holm* reads as follows:

"The construction and installation of the tile shower floor and drain pipe in the insured's house was inherently defective in that it was inevitable that without the intervention of any for-

tuitous or chance occurrences, water would pass through the floor and/or drain into and onto the cement base on which the tile floor was laid." 393 S.W.2d at 365.

And later in the opinion the Court itself says:

"The parties stipulated that the construction and installation of the tile shower and drain pipe in the house was defective. *The inherent vice was in the shower stall." Id.,* at 366. (Emphasis supplied.)

The case proceeded not upon the question whether negligent construction constituted an "inherent vice," for that was assumed without discussion. Rather, the issue was whether the ensuing loss provision * would apply. The Court held that it did—but recovery was allowed only for damages relating to replacement of the rotted flooring. No recovery was allowed by the trial court for the cost of the shower pan which was replaced, because the shower pan was an "inherent vice." In offering a definition of "inherent vice," the *Holm* court stated, at 367:

"The term 'inherent vice' as a cause of loss not covered by the policy, does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction. The vice must be inherent in the property for which recovery is sought."

So far this does not sound like a plaintiff's case. But plaintiff cites *Holm* for its language on "inevitability." The parties in the case, as in the case at hand, had stipulated that neither the insurer nor the insured knew at the time the contract of insurance was made that

there was no shower pan *beneath the shower.* The Court said:

"Under these circumstances we are of the opinion that the damage was not inevitable in the sense that the peril was not a risk but a certainty that could not be insured against. . . In one sense the damage was fortuitous since neither party knew or contemplated that there was any defect of any kind in the shower stall or that any damage would result therefrom to the flooring of appellee's house. So far as the parties were aware at the time the policy was issued any loss such as that sued for herein would be dependent upon chance. We quote from Restatement of the Law of Contracts, Sec. 291 'a' as follows:

"'A fortuitous event within the meaning of the present and subsequent Sections is an event which so far as the parties to the contract are aware, is dependent upon chance . . . it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties. . . .'"

As stated above, both parties have claimed *Holm* for their own purposes. The case definitely helps out Essex House with its discussion of certainty versus risk, and provides guidance on two aspects of inevitability. On one level the case stands for the proposition that from a legal standpoint it is not "inevitable" that a wooden floor would be damaged when a shower stall was improperly constructed in a house. This despite the fact that common sense would dictate that it is certain that the shower would be put to normal use and that continually draining water is bound to

---

* The mechanics of a typical ensuing loss provision can be found in *Aetna Casualty & Surety Co. v. Yates,* 344 F.2d 939 (5 Cir., 1965), at 941. There the main policy excluded "loss . . . caused by rust, rot . . . dampness of atmosphere." An exception to this exclusion was "ensuing loss caused by . . . water damage." The Court stated that a likely case for the application of the clause would be if water used in extinguishing a fire or coming from a burst pipe flooded the house and, in turn, caused rust or rot; loss from rust or rot so caused would be a loss ensuing on water damage.

have deleterious effects upon cork and wood flooring. The collapse of the face brick within the three-year limit of an insurance policy would, relative to the more or less common occurrences in *Holm*, seem far less certain.

The case is helpful to plaintiff on a much broader level than this, however, for, in finding that a fortuitous event is a loss arising from a defect unknown to the parties, the Court rejected the temptation to use hindsight. And this resistance is to the benefit of the Essex House because one of defendant's claims is that the face brick was bound to collapse within the policy time limits. Plaintiff points out, however, that even the defense experts were unable to state that it could be predicted with certainty when the loss would occur. *Holm* lends support to this argument, and it should be noted that the building had made it through one Cincinnati summer (1965) before it fell.

While these aspects of *Holm* are helpful to plaintiffs, it should not be forgotten that the parties had stipulated that the negligently constructed shower stall constituted an inherent vice. Why the parties were so apparently willing to stipulate to this cannot be ascertained from the reported facts, but the reason the point was not pressed by the plaintiff is probably that he had a good chance of recovering under the policy's ensuing loss provision. In our case that avenue is not open to the Essex House, for no loss ensued upon the collapse of the brick facing.

The third case which plaintiffs rely upon is *General American Transportation Co. v. Sun Insurance Office, Ltd., supra.* This is plaintiff's "make or break" case. Discussion of it will be deferred until after the following summary of defendant's key cases.

In *Aetna Casualty & Surety Co. v. Yates,* 344 F.2d 939 (5th Cir., 1965), plaintiffs discovered that joists, sills, and subflooring of their house were almost completely rotted away, due to inadequate ventilation of the "crawl space" beneath their house which caused trapped air to condense and produce rotting.

Excluded from plaintiffs' "Homeowner's All Risk" policy was loss caused by "inherent vice . . . rot." As in *Holm* the issue involved not the main policy, but the exclusion, an exception to which in this case was ensuing loss caused by water damage. The Court ultimately disallowed recovery under the ensuing loss provision, saying that to hold otherwise would be to give the words of the provision an unnatural effect. *Yates* is apparently cited by the defendant here because of a reference made by the Court to the "inherent vice" clause in the policy. While concluding that the damage to the house was the result of rot, the Court said that "plaintiff's loss could be said to be 'caused' by the defective construction of the house, arguably an 'inherent vice' . . . ." 344 F.2d at 941. This is a far cry from a concrete holding that negligent construction is inherent vice, but it is at least an indication that one court might be persuaded to that viewpoint under other circumstances.

Another of defendant's cases is *Greene v. Cheetham,* 293 F.2d 933 (2 Cir., 1961), and it contains some language that must be reckoned with. A Chicago fish-packing company purchased three shiploads of frozen fish from an English company. When the shipments reached New York the fish were found to be unfit for human consumption and were condemned. The parties stipulated at trial that there was no change in the condition of the fish after the fish were stowed on board at the English seaports from which they were shipped until they were condemned in the United States. Since the trial court had made no finding whether the fish were unfit before the overland England leg of the trip, or became so on the way to the English seaports, the Second Circuit remanded for evidence on this question. In doing so the Court addressed itself to the question whether the condemnation loss would be covered by an all-risk insurance

certificate of a type which was negotiated by each intermediate holder of the frozen fish. The certificate excluded loss caused by inherent vice which was treated by the trial court as being inoperative. The Second Circuit disagreed and said the "all-risk" event covered by the policy:

" . . . would not include an undisclosed event that existed prior to coverage or an event caused by the consummation during the period of coverage of an indwelling fault in goods that had existed prior to that coverage. Otherwise the underwriters are in the position of either having to pay for undisclosed loss or damage actually caused prior to the time of coverage or uncontemplated loss or damage caused by deteriorating agents present within the goods when the goods were shipped. . . . Fish designed for human consumption, if unfit for consumption when shipped, would inevitably be condemned. Hence there would be no insurable risk of loss but a certainty of loss. To hold otherwise would be to impose upon the insurer a guaranty of the good quality of the fish as and when packed by the shipper, which liability under the policy the insured had not assumed." 293 F.2d at 937.

Before commenting on this case, another of defendant's cases, *Chute v. Northern River Insurance Co.*, 172 Minn. 13, 214 N.W. 473 (Minn., 1972), should be briefly summarized, Chute held that recovery for the cracking of an opal must be denied under a policy which specifically insured against breakage. The reason was the presence of an inherent defect exclusion, and the evidence showed that the opal cracked as the result of an inherent defect.

Both *Greene* and *Chute* appear at first glance to provide strong support for the defendant in our case. However, both are distinguishable on the ground that in both cases the loss was brought about by a nonobservable flaw in the insured goods. As such the cases are not analogous and do not compel a denial of recovery for the Essex House loss. A more appropriate analogy would be between, say, the *bricks* of Essex House and the fish and gem in *Greene* and *Chute*. Surely the respective insurance companies would not have written the policies if the fish were observed to have green mould on their gills or the opal was visibly cracked. These would operate as signals to a potential insurer that something was wrong with the goods. In our case the window placement and noticeable lack of headers would amount to the same sort of red flag. Had the header bricks been found to contain too much sand, for example, and were thus inherently weak, *Greene* and *Chute* would be more persuasive. But no evidence whatsoever was introduced to show that the headers—or any other component of the Essex House—broke because of the "consummation of an in-dwelling fault." Unlike the fish and the opal, the bricks did not carry within themselves the seeds of their own destruction.

Plaintiff's strongest case is *General American Transportation Co. v. Sun Insurance Office, Ltd., supra*. In *Sun* the litigation grew out of a construction project which involved the erection of a unique underground silo as part of a propulsion engine attitude test facility. During the time that fresh concrete was being poured to erect the cap of the structure a temporary shoring platform collapsed under the weight of the concrete. The entire temporary steel falsework and all the fresh concrete fell some 250 feet to the bottom of the silo, causing vast property damage.

The District Court found that the damages sustained by the plaintiff resulted from a combination or concurrence of proximate causes, including at least the negligent welding by the plaintiff's workmen in prefabrication of the highly-stressed top flange of the insert at a truss, which apparently failed and permitted an increased deflection of that truss, which, in turn, resulted in local

or general buckling of the bottom chord involved and a transfer of the resulting overloading to adjacent trusses—that, thereupon, the entire falsework system failed almost simultaneously.

The District Court stated, at 845:

"It would be redundant to undertake to fix any further cause of loss, because ' . . . where a policy expressly insures against direct loss and damage by one element, but excludes loss or damage caused by another element, the coverage extends to the loss even though the excluded element is a contributory cause. . . .' *Fireman's Fund Ins. Co. of San Francisco v. Hanley,* 252 F.2d 780, 783, 785 (6 Cir., 1958)."

In *Sun* the insurance policy covered all risks of physical loss to property, an exception from the coverage being "loss or damage due to . . . inherent vice [or] latent defect."

Appellant insurer contended that the damage was the direct result of faulty design and that "no risk was involved, but rather a certainty" and that the collapse was not a risk within the coverage of the policy; that the collapse of the structure resulted from an "inherent vice" or a "latent defect," and was thus excluded from coverage under the terms of the policy.

The Court of Appeals, however, agreed with the District Court's finding that the defective welding was not an "inherent vice or latent defect" within the meaning of the policy. On this point, the District Judge had said:

"Any such negligence of the plaintiff's workmen in making the prefabrication welds constituted a fortuitous and extraneous event and was not a necessary or normal consequence of the work. . . . Such defect was not a latent defect; it could have been discovered with proper inspection. . . . ' "A latent defect is one that could not be discovered by any known and customary test." . . .' *General Motors Corp. v. The Olancho,* D.C.N.Y. (1953), 115 F.Supp. 107, 118

[7], aff'd C.A.2d (1955), 220 F.2d 278, on the opinion of the District Judge."

As in *Sun* the insurer in our case contends that the damage was the result of, among other things, faulty design and that this constituted no risk but an uninsurable certainty and that the collapse of the face brick resulted from an "inherent defect."

On the strength of the *Sun* decision, however, these contentions must be rejected. The *Sun* case specifically held that negligent design and workmanship, such as was present in the Essex House, did not constitute an inherent vice or latent defect. The Court in *Sun* also expressed the view that the defect could have been detected through reasonable inspection, such as radiography. Nothing more than a simple visual inspection of the Essex House and the construction plans would have been sufficient to detect the shoddy building techniques employed therein.

Defendant, naturally, seeks to distinguish away the *Sun* case. It argues, first, that there the insurance policy "significantly" (though defendant does not explain the significance) excluded inherent *vice* and latent *defect,* whereas the policy covering the Essex House excluded inherent or latent *defect.* There does not seem to be any significant distinction between these terms and defendant has not drawn our attention to one.

Defendant also argues that the *Sun* case involved negligence caused by the plaintiff's own workmen and that the defective welding occurred after the policy was issued. In light of the Sixth Circuit's emphasis, however, on the principle that an all-risk insurance policy should be required to cover *all* risks (including the risk of negligent workmanship), this distinction is not significant. Neither the trial court nor the appellate court made any reference at all to this suggestion, despite the fact that both courts placed strong emphasis on the *Hanley* case, which might be de-

scribed as a "typical" all-risk policy litigation. (In *Hanley* a house perched on a bluff collapsed. The insurance company claimed the all-risk policy did not cover the loss because it was due to an inevitable landslide, which was expressly excluded. The Court of Appeals said the inevitability issue was a question of fact, and that the jury properly concluded that the landslide was not inevitable. While Exclusion B of the policy expressly excluded landslides, the Sixth Circuit concluded that this may have been done through inadvertence in light of the other exclusions of "B". Furthermore, the Exclusion C schedule, to the Court a much more likely place for landslides to have been excluded, did not list landslides. "An ambiguous provision in an insurance policy should be read against the insurer who writes the policy." *Turner v. Fidelity & Casualty Co. of New York,* 112 Mich. 425, 429, 70 N.W. 898.) An "all-risks" policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage. *C. H. Leavell & Co. v. Fireman's Fund Ins. Co.,* 372 F.2d 784 (9 Cir., 1967). See Coverage Under All Risks Insurance, Anno. 88 A.L.R.2d 1122, 1125 (1963). Had the parties in our case intended to exclude negligent workmanship and faulty design (or, for that matter, loss due to high temperatures), it would have been a simple matter for the insurer to have included express terms more consistent with that result.

For the above reasons we find for the plaintiff, *i. e.,* we conclude the brick failure was covered by the ALL–RISK policy.

Entry accordingly.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ISSUE OF DAMAGES

This is a diversity case in which plaintiffs seeks a declaratory judgment (28 U.S.C. § 2201) to determine their right of recovery—and amount of recovery—under an "all risk" insurance policy (Policy #666 NB 3959) issued by defendant to plaintiffs. On July 4, 1966, during the term of the policy, there was a brick failure on "The Essex House," Plaintiffs' insured apartment building. A considerable portion of the brick facing on the insured building detached from the back-up block and either fell to the ground or was thereafter removed.

By prior findings of fact and conclusions of law (doc. 31), this Court determined the issue of liability, deciding that the brick failure was a covered risk under the policy. Thus, the remaining issue to be determined is the amount of recovery. In lieu of an evidentiary hearing on the issue of damages, the parties have submitted this matter on briefs (plaintiffs' brief, doc. 37; defendant's briefs, docs. 39, 40); an agreed stipulation of damages (doc. 38); certain depositions; and some previously submitted exhibits.

The stipulation referred to above is an immensely helpful submission in which counsel for both sides have invested great effort in order to simplify some rather complex questions of damages. The stipulation consists of 12 statements or, in certain instances, sets of alternative statements. The parties concur in the first seven statements which deal generally with background factual information. We hereby accept those statements and incorporate them herein as findings of fact. In this regard we merely stress that, as appears, in statement 7, plaintiffs' claim under the policy is not based upon restoration work which was actually done on Essex House, but upon estimates of what it would have cost for repair and replacement with material of like kind and quality.

At statement 8 (doc. 38, p. 3), the parties began to part company and to present alternatives, for at that point they began to "differ on the legal scope of the various coverages under this po-

licy" (doc. 38, pp. 3–4). These legal differences may be roughly broken down into the following main areas: Direct repair costs for general contractor work; direct repair costs for work done by people other than general contractor; rent loss; indirect loss; and prejudgment interest.

Despite their differences on the above points, the parties did stipulate as to nearly all the factual elements involved in calculating the various damages so that, depending upon which legal conclusions this Court adopts, the actual damage figures are largely undisputed. We propose to address the above five categories in turn. In doing so we shall set out, where appropriate, our findings of fact and conclusion of law as to each category.

## I. DIRECT REPAIR COSTS FOR GENERAL CONTRACTOR WORK

██ 1. We conclude that under the policy coverages, defendant is required to pay reconstruction costs not only for the 6,742 square feet of brick facing which actually fell, but also for the 16,028 square feet which "pulled away" from the back-up block.

██ 2. We further conclude that defendant is not liable for any "increased" general contractor costs (that is, costs in excess of those which would be incurred for reconstruction of "like kind and quality") required by Cincinnati Building Commissioner standards, nor is defendant liable for architect and engineer fees which would be incurred in meeting such standards. In short, we conclude that defendant is only liable for the cost of repair, as originally built, of 22,770 square feet of brick facing.

3. We find, in accordance with the stipulation at p. 6 that the repair cost for such general contractor work (as originally built) is $87,131.91.

## II. DIRECT REPAIR COSTS FOR WORK DONE BY PEOPLE OTHER THAN GENERAL CONTRACTOR

██ 1. We find that certain other direct repair costs would have been necessary to restore Essex House to its original condition and that defendant is liable for such costs. These repair items are listed, as items 1 through 10, on p. 8 of the stipulation. The costs of items 2–10 are undisputed (doc. 38, p. 8) and since we find the stipulated figures to be reasonable, they are accepted and incorporated herein as our findings of fact. With regard to item 1, we find that the reasonable cost for removal of brick and exterior cleanup is $18,308.06, and we further find that the reasonable cost of interior cleanup is $2,503.39. Accordingly, we find that the total cost for items 1–10 (doc. 38, p. 8) is $31,690.79.

██ 2. Plaintiffs' also seek recovery for costs which were incurred in removing and storing furniture for tenants of Essex House who were "evacuated" (item 11) and for costs which were incurred in providing certain tenants with food and motel accommodations (item 12). Similarly, plaintiffs seek to recover reimbursements which were made to other tenants for those furniture, food and housing costs (item 13). We conclude however that the above costs (item 11–13) do not fall within the policy coverage and that defendant is not liable therefor. Hence, the total "repair costs by other than general contractor" for which defendant is liable is $31,690.79.

## III. RENT LOSS

Statement 9 of the stipulation (doc. 38, pp. 9–11) deals with rent loss. The parties have stipulated that the amount of recovery for rent loss, under Rider No. 201C–3 of the policy, must be one of five figures depending upon which conclusions of law this Court adopts.

1. We conclude that the provisions of the Rent Rider limit recovery to the amount of rent lost during the theoretical time of repair—*i. e.*, rent loss may only be recovered for the time it would have taken to make "like kind and quality" repairs.

2. We find that it would have taken seven months to reconstruct and repair the 22,770 square feet of brick facing in the "like kind" manner discussed previously, and we further find that in order to make such repairs it would have been necessary to evacuate 59% of the Essex House tenants for the full seven-month period. Hence, in accordance with figure (d) at p. 10 of the stipulation, we find and conclude that plaintiffs are entitled to recover $94,990 under the policy's Rent Rider provisions.

## IV. INDIRECT LOSS

The insurance policy contains an indirect loss provision with a $10,-000 limitation. We find and conclude that plaintiffs did suffer $10,000 worth of such indirect loss, not otherwise set out in any of the above claims of loss. Plaintiffs should therefore recover $10,-000 under this category.

## V. SUMMARY OF CATEGORIES I–IV

Thus far we have determined the amount of recovery for each of the separate categories I–IV set out above (*i. e.*, direct repair costs for general contractor and others; rent loss; and indirect loss). The total of these amounts is $223,812.70.

## VI. PREJUDGMENT INTEREST

It is settled law that prejudgment interest is allowed as a matter of right for failure to pay liquidated claims when due. Not surprisingly, therefore, the parties argue at length on the nature of the present claim. Although we agree with defendant that plaintiffs' claims herein are essentially unliquidated in nature, we do not think the liquidated-unliquidated distinction is dispositive in this insurance contract case. Instead, we think that prejudgment interest may be justified, even on an unliquidated claim "by the need for adequate compensation so as to make the injured party whole." *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1198 (6th Cir., 1974). See generally, 22 Am.Jur.2d, Damages §§ 179, 181 and 185.

In the instant case, we believe that an award of prejudgment interest is justified. We hasten to add that we do not regard this as a penalty of any kind, for we do not question defendant's good faith nor do we find any evidence of dilatory tactics or purposeful delay on defendant's part. However, the defendant has presumably enjoyed an investment return in excess of 6% during the 8 years or more of this suit's pendency and, in any event the award of prejudgment interest herein is necessary in our opinion to adequately compensate the plaintiffs for their covered losses. Since our award of prejudgment interest is grounded upon the need to give plaintiffs fair and adequate compensation for their covered losses, and not upon defendant's failure to pay a liquidated claim when due, we do think it appropriate to award interest from the date of loss as urged by plaintiffs (see statement 12 of the stipulation, doc. 38, at p. 13). Indeed, defendant suggests no alternative interest-onset dates, but merely notes that due to problems regarding "ascertainment of the loss," this is not a case "in which the policy itself provides the time at which interest is to begin running" (doc. 39, p. 18). Accordingly, we conclude that plaintiffs herein are entitled to prejudgment interest on the sum of $223,812.70, at 6% per annum, from July 4, 1966.