**PROVIDENCE WASHINGTON INSURANCE COMPANY, Appellant,**

v.

**Lottie H. STANLEY, Individually, etc., et al., Appellees.**

No. 25976.

United States Court of Appeals
Fifth Circuit.

Nov. 26, 1968.

Rehearing Denied Jan. 13, 1969.
See 406 F.2d 735.

Joseph S. Mead, Mead, Norman & Fitzpatrick, Birmingham, Ala., for appellant.

W. H. Baldwin, Andalusia, Ala., for appellee, Charles Little.

Oakley Melton, Jr., M. Roland Nachman, Montgomery, Ala., Griffin Sikes, Andalusia, Ala., for appellee, Lottie H. Stanley, and others; Steiner, Crum & Baker, Montgomery, Ala., Powell & Sikes, Andalusia, Ala., of counsel.

Before JOHN R. BROWN, Chief Judge, and RIVES and McENTEE *, Circuit Judges.

RIVES, Circuit Judge:

This is a diversity suit seeking recovery under an institutional fire insurance policy. Providence Washington Insurance Company (hereinafter the "Company") appeals from a judgment entered on a general jury verdict finding it liable to Mrs. Lottie H. Stanley, in her individual capacity and as executrix of her husband's estate, for a $52,226.87 fire loss to the Covington Memorial Hospital building and its contents. The same jury also found no alternate liability of the local agent of the Company, Charles Little, who had been made a third-party defendant in the action on a theory of fraud and misrepresentation. We affirm.

## I.

*The Critical Facts.* On February 1, 1964, the Company issued a five-year Public and Institutional Property Fire and Extended Coverage Form Policy to the following named insured:

"Covington Memorial Hospital
104 East Watson Street
Andalusia, Alabama."

This policy was delivered to Graydon Stanley who, together with his wife, Mrs. Lottie H. Stanley, had operated the facility under the above trade name since 1941. The policy was issued under a reduced-rate institutional coverage plan offered through and administered by the Alabama Inspection and Rating Bureau [1] and filed with the State Insurance Department. The form policy contained, *inter alia,* a standard occupancy clause suspension of coverage provision.[2]

At the time the insurance contract was executed, title to the building and its contents was held by Covington Memorial Hospital, Inc., a family corporation of which the Stanleys held absolute

---

* Of the First Circuit, sitting by designation.

1. A public or private institution meeting certain standards established by the Alabama Inspection and Rating Bureau could participate in this coverage program. A policy would be written by the Company with coverage limitations set by a "Statement of Values" filed on the policy anniversary date by the insured with the Bureau and premium payments computed thereon. In addition, the continued eligibility for the plan was conditioned upon the institution conforming to certain safety and maintenance standards. Compliance therewith was determined through periodic self-inspection reports filed with the Bureau by the insured. All parties to the contract received informational copies of the statements and inspection reports.

2. "Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring * * * (b) while a described building, whether intended for occupancy by owner or tenant, is vacant or unoccupied beyond a period of sixty consecutive days. * * * *"

control and all but one share of stock.[3] The corporation was formed one year earlier for reasons not relevant to the case *sub judice*. Theretofore, the Stanleys had held one-half individual ownership interests in the hospital building and its contents; and they had run the enterprise through a partnership arrangement. At the time the policy was executed, the Stanleys actively managed the facility.

Two years and eight months after the policy was issued, Mr. and Mrs. Stanley decided to cease the active management of the facility. Without any disruption of hospital services and with no employee dislocations, the Stanleys leased the facility to Andalusia Hospital Corporation (AHC) on September 1, 1965.[4] AHC continued to operate the hospital under its original trade name, Covington Memorial Hospital. From this date forward, neither of the Stanleys ever actively managed Covington Memorial Hospital. Nevertheless, Mr. Stanley, individually and as owner of the facility, paid the policy premium and filed the annual "Statement of Values" for 1966 even though he no longer ran the hospital. In December 1965, the Stanleys dissolved their corporation, Covington Memorial Hospital, Inc., and as a result individual interests in the building and its contents reverted to each.

On April 27, 1966, Mr. Stanley was critically injured in an automobile accident. The next day AHC vacated the Covington Memorial Hospital facility to occupy its newly completed complex. On May 5, 1966, Mr. Stanley died of his injuries. His will, probated on June 6, 1966, named Mrs. Stanley as Executrix-Trustee and devised Mr. Stanley's own one-half interest in the hospital and its contents one-fourth to his wife in fee and one-fourth to her as trustee for their three minor daughters.

In June, one month after her husband's untimely death and AHC's vacation of the Covington Memorial Hospital facility, Mrs. Stanley went to the offices of the Company's local agent, Little-Teel Insurance Agency, to inquire what she should do about insuring the now inactive facility and its contents. She informed Little that she could not find the original policy he had written for her husband. She also told him that she planned to liquidate the complex rather than attempt to find another tenant. Little assured her that she was adequately covered under the original policy and that she need not worry about changing coverage until she had completely liquidated the building and its contents. In reliance thereon, Mrs. Stanley commenced liquidation, advertising her intentions and keeping regular business hours in the hospital office eight hours a day, six days a week.

With knowledge that the facility was no longer an "operating hospital" and with knowledge that liquidation thereof had commenced,[5] Little engaged in certain questionable and unexplained conduct. On June 6, he received an informational copy of a notice of delinquency of filing the self-inspection report; the notice was sent by the Bureau to the Company. On the bottom thereof, he made the following notation: "This policy will be cancelled effective July 1,

---

3. Code of Ala., Tit. 10, § 21(3) (Supp. 1967) requires *three* incorporators. In order to comply with this provision, the Stanleys incorporated using as the third incorporator a hospital supervisor, Joe Brooks, who received *one* share.

4. AHC, at the time of this agreement, was engaged in a hospital construction program with a completion date scheduled for less than a year away. It can safely be assumed that AHC's entry on the scene was either voluntarily timed with the Stanleys' decision to cease active hospital management or at least contributed to their determination to leave the field.

Regardless of the underlying motivation, the Stanleys leased their facility and its contents to AHC as an interim facility for $5,000 per year. AHC also purchased from the Stanleys for slightly over $7,000 all consumable supplies, i. e., drugs, medications, bandages, etc.

5. Little even admitted purchasing office equipment for himself from Mrs. Stanley during the liquidation process.

1966." The letter, with notation affixed, was then mailed on June 10 to the Bureau. Yet on June 13, Little personally completed the self-inspection report in which he indicated, *inter alia*: the hospital was still operational; boiler, laundry, and automatic sprinkler systems were adequately maintained; elevator service was working; and a night watchman was still on the payroll. He signed without authorization the names of two former Covington Memorial-AHC supervisors as certifying the above information; and he added his own signature as an endorsement thereof. *He subsequently admitted that he knew all of the information was false.* Yet he mailed this report to the Bureau, with information copies of it eventually getting to the Company. A Bureau agent testified that the receipt of the report indicated to him that the facility was still an operational hospital. He further stated information to the contrary would have required discontinuance of eligibility for coverage under the plan, not to speak of possible investigation of why such information was not reported initially. Little's only explanations of his irregular actions were that the inspection reports were "merely routine" and his unshakeable belief that the facility was "a hospital until it was completely liquidated." Finally, not once during the interim between AHC's vacation of the premises on April 28 and the fire loss on October 8, 1966—a period of almost six months—did Little ever communicate the true situation to the Company, to its state manager, or to the Bureau.

In the context of the foregoing facts, the issue of ultimate liability for the loss is controlled by determination of two questions: (1) Was Mrs. Stanley, individually and in her representative capacity, an "insured" under the institutional policy? (2) Was her non-operational facility "occupied" within the meaning of the policy suspension provision or, if not technically occupied, was the Company barred by operation of law from asserting its right of suspension?

But for its abandonment on appeal, there would be a third question, viz.: (3) The Company having been found liable, does the jury verdict in Little's favor properly exonerate him from partial or total liability for alleged perpetration of fraud and misrepresentation on the Company?

## II.

*Designation of the Insured.* The policy designated as the insured "Covington Memorial Hospital," without any reference to its corporate existence. Mr. Stanley, who had done business under the trade name Covington Memorial Hospital for over twenty years, was issued the policy written by the state manager and local agent of the Company. Mr. Stanley paid every premium and filed every "Statement of Values" as each came due. Less the value of one share of stock, the Stanleys' interest in the insured property was identical whether held as stockholder or as partners. After her husband's untimely death, Mrs. Stanley held the exact same interest which she possessed at the time the policy was executed, enhanced by her husband's testamentary disposition of his entire interest part to her individually and part to her as trustee for their daughters.

■■ In order to recover on a fire insurance policy, the claimant must show an existing contract and an insurable interest in the property. See 4 J. Appleman, Insurance § 2121, p. 18 (1941). Otherwise, the contract is void notwithstanding even an honest but erroneous impression by both insurer and insured that an insurable interest exists. 4 J. Appleman, supra, § 2122, p. 19. According to Alabama law, moreover, such insurable interest must exist both at the time of contract execution and at the time of the loss. Girard Fire & Marine Ins. Co. v. Gunn, 1930, 221 Ala. 654, 130 So. 180, 183. Accord: Commercial Union Fire Ins. Co. of New York v. Parvin, 1966, 279 Ala. 645, 189 So.2d 330, 332.

■■ The overwhelming majority of jurisdictions, including Alabama, recog-

nize that a stockholder in a corporation has a legal insurable interest in its property in proportion to the amount of his stockholdings. Aetna Insurance Co. v. Kennedy, 1909, 161 Ala. 600, 50 So. 73, 74; see 4 J. Appleman, supra, § 2145, pp. 41–43. Whether as stockholders or as partners, the Stanleys were the uncontroverted owners of the entire interest in the building and its contents, entitled to contract with the Company to protect their investment. Compare Weisfeld d/b/a M & W Fruit Co. v. St. Paul Fire & Marine Ins. Co., S.D.Tex. 1964, 236 F.Supp. 496, 499, aff'd per curiam, 5 Cir.1965, 354 F.2d 241, with Booker T. Washington Ins. Co. v . Transcontinental Ins. Co., N.D.Ala., 1966, 263 F.Supp. 1005. See also Travelers Indemnity Co. v. Israel, 2 Cir.1965, 354 F. 2d 488. Consequently, Mr. Stanley, whether as co-holder of all controlling stock in the corporation or as partner in the enterprise doing business as Covington Memorial Hospital, had a legally insurable interest at the time the policy was issued to him.

The Company contends, nevertheless, that it contracted with the corporate entity only and not with Mr. Stanley. Most damaging to this position is the uncontroverted evidence that no corporate designator was appended to the trade name designation of the named insured in the policy and the undisputed fact that the Company accepted without question four premium payments and four filings of annual Statements of Values made by Mr. Stanley individually and as owner of the hospital. The law is clear in such situations:

> "Obviously there is no requirement that a person must be described by name in order to be an insured under the policy. It is sufficient if his identity as an insured can be ascertained by applying the description contained in the policy."

4 J. Appleman, supra, at § 2341, p. 51 (Supp.1968). Moreover, this Court has indicated a refusal "to read into insurance policies the rigid rules of property

title law." Dean v. Pioneer Co-operative Fire Ins. Co., 5 Cir.1956, 231 F.2d 18, 21. See 4 J. Appleman, supra, § 2471, pp. 629–637.

Furthermore, the cardinal rule of construction of insurance contracts is that the manifest intention of the parties should control. See American Aviation & General Insurance Company v. Georgia Telco Credit Union, 5 Cir.1955, 223 F.2d 206. See also 29 Am.Jur. § 247, pp. 628–629 n. 19; 13 J. Appleman, supra, § 7385, pp. 29–36. Should any confusion or ambiguity exist now as to who constituted the named insured, it is well established that the policy must be construed most favorably for the insured. Centraal Stikstof Verkoopkanter, NV v. Walsh Stevedoring Co., 5 Cir. 1967, 380 F.2d 523, 534 (applying Alabama law); Trinity Universal Ins. Co. v. Robert P. Stapp, Inc., 1963, 278 Ala. 209, 177 So.2d 102, 104; Trans-Continental Mut. Ins. Co. v. Harrison, 1955, 262 Ala. 373, 78 So.2d 917, 921. See 29 Am.Jur. § 258, pp. 640–642 n. 9; 13 J. Appleman, supra, § 7401, p. 50 n. 1. Mrs. Stanley, therefore, had an insurable interest in the property which was valid at time of execution of the policy and at time of loss, and she could rightfully sue in her own name and as executrix under her husband's will.

### III.

*Property Liquidation and the Occupancy Clause.* Although the facility was no longer an "operational hospital," Mrs. Stanley did maintain regular office hours therein during the process of liquidation prior to the fire loss. Moreover, she relied upon Little's assurance that the original policy would cover her property until liquidation was completed.

The recognized purpose for inclusion of a standard occupancy clause is to avoid liability where the risk has been increased by vacancy. Cf. Niagra Fire Ins. Co. v. Everette, 5 Cir.1961, 292 F.2d 100; 29 Am.Jur. § 882, p. 94; 4 J. Appleman, supra, § 2849, p. 798. Clearly, also the courts have recognized the insurer's privilege to include a provision

850

in a policy that unoccupancy shall be, of itself, an increase in the risk sufficient to suspend coverage; or the company may insert therein a reasonable provision conditioning coverage of the property on continued use as a particular type of facility. See 29 Am.Jur. § 895, pp. 104–105; 4 J. Appleman, supra, § 2876, pp. 818–819. In the instant case, the Company failed to avail themselves of the right to prescribe occupancy *as an operating hospital* to be a condition for continued coverage. The occupancy clause must therefore be given its customary meaning under Alabama insurance law. See Trinity Universal Ins. Co., Dallas, Tex. v. Wills, 1962, 273 Ala. 648, 143 So.2d 486. Alabama law leaves determination of this question to the jury where a material dispute exists on the facts. Trinity Universal Ins. Co. v. Wills, supra. Cf. Ammons v. Franklin Life Ins. Co., 5 Cir.1965, 348 F.2d 414, 416, 14 A.L.R.3d 776 (applying Alabama law).

But even if Mrs. Stanley's property was technically unoccupied within the meaning of the policy's suspension provision, the Company was barred by operation of law from asserting such a defense in order to escape liability. Mrs. Stanley expressly informed Little of her apprehension concerning coverage under the original policy and of her intention to liquidate the facility. Thereupon, he assured her that her property was covered by the original policy until liquidation was completed. He had authority to write a new policy, but chose to rely on the original one.

This Court has recognized that coverage may not be extended on the basis of waiver or estoppel,[6] Harrison v. Liberty Mut. Ins. Co., 5 Cir.1961, 290 F.2d 900, 903–904, but it has also indicated that denial of a right to assert a policy suspension or forfeiture provision on the basis of waiver or estoppel does not amount to an extension of coverage. Reliance Ins. Co. v. The Escapade, 5 Cir.1960, 280 F.2d 482, 487, 86 A.L.R.2d 1236. The title on the occupancy clause ("Conditions suspending or restricting insurance") clearly reflects that it was a mere suspension provision.

The Company's vigorous assertions that Little's individual actions should not bind it may be accepted arguendo; yet the occupancy clause may not be the basis for Company avoidance of liability on the policy. Little's assurances to Mrs. Stanley unquestionably led to her reliance on the original policy. The instant case was not a mere notice-followed-by-agent-inaction situation. Little's advice caused her to abandon any further inclination to seek a change in coverage; the Company now seeks to "profit" from its agent's questionable and allegedly erroneous advice. It is barred by the principle of estoppel. Travelers Indemnity Co. v. Holman, 5 Cir.1964, 330 F.2d 142, 150–151.

IV.

*Little's Liability as Third-Party Defendant.* The Company asserted that Little's advice and his unexplained completion of the self-inspection report, together with conscious failure to inform the Company and the Bureau of the true situation, constituted an unauthorized waiver of the Company's rights and fraud and misrepresentation on the Company. He was made a third-party defendant in the case and was examined under oath by Company counsel at trial. Regardless of this Court's own appraisal of Little's conduct, the question of his joint or individual liability was submitted to and determined by the jury in Little's favor, and that finding is not questioned on this appeal.

6. Care must be exercised not to confuse the principles of waiver and estoppel even though their result is often the same. They are clearly distinguishable. Waiver is the intentional relinquishment of a known right; estoppel is the abatement by operation of law of the insurer's original right because of the insured's prejudicial reliance on the insurer's action or inaction. Estoppel, therefore, does not depend on a voluntary relinquishment by the insurer. See 16A J. Appleman, supra, § 9081, pp. 279–282.

On appeal the Company has chosen to abandon its third-party action against Little by refusing to specify any error in the verdict and the judgment entered thereon, as well as by conceding at oral argument the validity of the jury verdict for Little.

### V.

The trial court's charge having correctly set out the legal issues reviewed above and the jury having returned verdicts in favor of Mrs. Stanley and Little, the judgment of the district court is

Affirmed.