**J. RAY McDERMOTT & CO, INC., Pogo Producing Company and Pennzoil Company, Plaintiffs,**

**v.**

**FIDELITY & CASUALTY COMPANY OF NEW YORK, Citadel Insurance Co., All American Marine Slip, National Surety Corporation, Midland Insurance Company, Utica Mutual Insurance Co., Royal Indemnity Company, Reed & Brown, Inc., Affiliated FM Insurance Co., Employer's Mutual Liability Insurance Co. of Wisconsin, Unigard Mutual Insurance Co., Underwriters at Lloyd's Insurance Companies, London and London Companies, Defendants.**

Civ. A. No. 77-3091.

United States District Court,
E. D. Louisiana,
New Orleans Division.

March 2, 1979.

John Nesser, New Orleans, La., for plaintiff J. Ray McDermott.

Donald R. Abaunza, New Orleans, La., for plaintiffs Pogo Producing Co. and Pennzoil Co.

Randy J. McClanahan, Houston, Tex., for plaintiff Pogo Producing Co. and Pennzoil.

Ralph Smith and Allen F. Campbell of Deutsch, Kerrigan & Stiles, New Orleans, La., for defendants.

DANIEL HOLCOMBE THOMAS, Senior District Judge, Sitting by Designation.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this cause was held December 18, through December 20, 1978, in New Orleans, Louisiana. The case was tried to the Court, Senior Judge Daniel H. Thomas of the United States District Court for the Southern District of Alabama, presiding by designation. After consideration of the testimony, evidence, argument of counsel and applicable law, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. J. Ray McDermott & Company (McDermott) was, and is, a corporation engaged in the business of construction of offshore structures related to oil production.

2. Pennzoil Corporation (Pennzoil) was, and is, a corporation engaged in the exploration for and production of petroleum.

3. On June 1, 1975, McDermott and Pennzoil entered into a blanket contract for the design, fabrication and installation of offshore structures in the Gulf of Mexico. The contract was applicable to all work performed by McDermott for Pennzoil between June 1, 1975, and May 31, 1976.

4. Pennzoil elected to build an eight-pile self-contained drilling platform in the High Island area under the blanket contract. On September 4, 1975, Pennzoil exercised an option under the contract to build a platform designated Pennzoil No. 11 on an equipment rental basis. That is, McDermott was to be reimbursed for the work pursuant to a published schedule of rates set forth in its published rental rate scale.

5. Pennzoil Platform 11 was to be located in block A340, High Island Area, off the Texas Coast.

6. Prior to beginning construction of the platform, McDermott through Adams & Porter, Inc. in Houston, obtained builders' risk coverage through Adams & Porter, McDermott's broker in Houston. The special policy, designated A & PH–5998, was an all risk manuscript form, written by Adams & Porter for McDermott, tailored to McDermott's particular needs.

7. Adams & Porter solicited various underwriters to subscribe to percentages of the risk. Marine Office of American (MOAC) as the representative of the underwriter having the largest share (Fidelity and Casualty Company of New York) was designated as lead underwriter, and thereby assumed responsibility for certain administrative functions under the policy.

8. Builders' Risk Policy A & PH–5998 was written in Texas; the premium was

paid in Texas; Texas tax was paid on the premium; the policy was delivered in Texas; and the structure insured was on the outer continental shelf off the Texas Coast.

9. Pennzoil Platform No. 11 may be described as a tablelike structure supported by eight legs. The legs are of sufficient length to support the upper level, or top of the platform, 10 feet above the surface of the water. The depth of the water at the construction site was 232 feet.

10. Pilings were driven through the legs to secure the platform to the bottom and consisted of a series of hollow steel cylinders, 48″ in diameter, having wall thickness from ½″ to 1½″. The lower end of each piling was fitted with a "driving shoe", which is a heavy steel cylinder, 4 feet in diameter, 5 feet long and having a wall thickness 1½ inches. The function of the driving shoe was to strengthen and protect the lower end of the piling as it was driven. Design of the pilings by the McDermott engineering staff specified driving shoes for use in penetrating the sands and clays anticipated during the pile driving operation.

11. Soil studies by McLellan Engineers predicted difficulty in driving of the pilings through the clay and sand strata.

12. Installation of the platform was accomplished by the McDermott Derrick Barge 23 (DB–23), a heavy lift derrick barge equipped with a 600-ton crane. When on location in the Gulf, the DB–23 was held in place by a series of 8 anchors extending in all directions and up to 3000 feet from the barge. By adjusting the length of the cables on the respective anchors, McDermott personnel could maneuver the DB–23 approximately 100 to 150 feet in any direction. To move the barge a greater distance, it was necessary to pick up the anchors (known collectively as an anchor spread).

13. The individual anchors which constituted the pattern are picked up and set by tugs working in association with the DB–23. The time required to pick up all 8 anchors varied from 4 to 6 hours, depending on the weather conditions at the time.

14. During heavy weather, when wind, sea and swell conditions interfere with work on the platform, the DB–23 is moved away from the platform 50–100 feet by adjusting the length of anchor cables. If the weather conditions increased in severity, all eight anchors are picked up, the derrick barge towed away to a remote location, and the storm anchor put down until it is safe to return. With moderating weather, the storm anchor is picked up, the derrick barge towed back, and her anchor spread set to permit work to resume on the platform. Time lost by the DB–23 due to weather was therefore classified either as weather time alongside or weather time on the storm anchor.

15. Pennzoil Platform No. 11 was fabricated in the McDermott yard at Amelia, Louisiana. Thereafter, it was loaded on board a barge for transportation to the work site in Block 340A, High Island Area. On October 4, 1975, the platform was launched and placed on location on the sea bottom.

16. After the platform was launched on October 4, work continued with the driving of pilings designated A–3 and B–2 on October 6, 1975.

17. Pennzoil retained Pollock Engineering and Lawrence-Allison & Associates to perform supervision and inspection functions during the installation phase of the project. William DeWeese of Lawrence-Allison and William Turner of Pollock were both responsible for looking after Pennzoil's interests.

18. Pilings in legs designated A–3 and B–2 were driven to a penetration of 322 feet and 272 feet respectively. Although both pilings were short of the design penetration of 360 feet, Pennzoil accepted the pilings as they were.

19. At the time, the first two pilings, Pilings A–3 and B–2 reached refusal, Whipple, Pennzoil's Manager of off-shore construction who was at home in Houston, was notified of the fact by DeWeese through a telephone-radio connection. It was on this occasion that Whipple instructed DeWeese to have the bottom 50 feet which included

the driving shoes, removed from the A–2 and B–3 pilings before the pilings were driven in order to have maximum wall thickness of the piling at the mudline.

20. Turner was onboard the DB–23 when driving actually began, but did not observe that the driving shoes were not reinstalled after the removal of 50 feet from the pilings and before this piling was driven.

21. Wayne Westerman, the McDermott field engineer assigned to the project, testified at the trial that he was unaware that the shoes had been cut off before these pilings were driven.

22. On October 15, 1975, McDermott began driving pilings A–2 and B–3. On October 19, pilings A–2 and B–3 met refusal at 88 feet and 105 feet, respectively. Divers were called out to inspect the lower end of the piling for possible irregularities. Notwithstanding the inspection by the divers, work continued on the next series of pilings designated A–4 and B–4.

23. On October 21, the divers reported that the lower end of the A–2 and B–3 pilings were crimped, or pinched, together below the mud line to such an extent as to preclude the use of jetting or any other technique to continue driving.

24. The divers' findings were reported to Pennzoil and McDermott. Because it was impossible to pull the pilings, or to drive new pilings in the vicinity of the damaged pilings, Pennzoil decided to remove all pilings and move the platform to a new location, 150' from the old location.

25. At 1940 (7:40 p. m.) on October 21, 1975, salvage operations began. Jet equipment was removed from the platform and the A–4 and B–4 piling was pulled. Divers descended into the A–3 and B–2, and A–2 and B–3 legs to cut the legs below the mud line. As the pilings were cut, the portion from the mud line to the surface was pulled and placed on a material barge for further use.

26. On October 23, the Derrick Barge 23 was required to leave the platform location because of heavy weather. The catwalk to the platform was taken in; all eight of the DB–23's anchors were heaved in, and the DB–23 was towed two miles away where she rode on her storm anchor. The DB–23 remained away from the platform, off location for 90 hours.

27. The DB–23 returned to the platform and resumed work on October 26. Divers were again sent down inside the pilings to cut the pilings below the mud line. The pilings were pulled from the legs by the DB–23 when the cutting was completed. Work continued until October 30.

28. On October 30, a heavy ground swell developed and work on the platform was suspended. The DB–23, remained on alongside her anchor spread, but was unable to work. On the following morning, the seas moderated and work resumed. A total of 24 hours was lost, but because the DB–23 remained on the location, the time was counted as "weather time alongside" and was counted as work time.

29. At 1700 on October 31, all cutting of four of the pilings had been completed and the pilings were removed. Caps were placed on the upper end of the platform legs to seal them, and air was pumped into the legs for buoyance to assist in lifting the platform.

30. On November 1, the weather conditions increased and at 11:10, the DB–23 picked up her anchor and moved 2 miles away, where she remained on her storm anchor until 0100 on November 4. The DB–23 was off location for 63 hours on storm anchor "weather time".

31. Work resumed on November 4 and continued until 1930 on November 9, when heavy weather made it necessary for the DB–23 to pick up its anchors and move away. DB–23 remained off the location awaiting more favorable weather until 1200 on November 14, a total of 114 hours on storm anchor weather time.

32. Work resumed on November 14, with jetting and driving of the A–2 and A–3 pilings. On November 15, 1975, driving continued on the A–3 pilings; on November 16, 1975, work continued on A–3 and B–3 pilings.

33. On November 17, 1975, at 1830, heavy weather required the DB–23 to move away from the platform. She remained off location, 2 miles distant on her storm anchor until 2330 on November 21, 1975, a total of 113 hours on storm anchor weather time.

34. Work resumed to the platform on November 21, and continued until 1200 when driving of the A–2, A–3, B–2 and B–3 pilings was completed. At the time, the platform was in essentially the same condition as it would have been had the two pilings not crimped one month earlier.

35. When the crimped pilings were discovered, McDermott engaged a marine surveyor, Mr. J. F. Wright, to represent McDermott's interests. Wright attended on board the DB–23 and observed the salvage operations undertaken by McDermott beginning at 1940 on October 21, 1975.

36. McDermott reported the crimping of the pilings to the broker, Adams & Porter. Adams & Porter confirmed the nomination of Wright as the surveyor to represent the assured's interests and forwarded a notice of claim to the underwriters.

37. Wright and his associate observed the salvage operations on the DB–23 and the platform and ascertained that the costs incurred by McDermott and Pennzoil during the salvage operations were fair and reasonable under the circumstances.

38. Salvage operations were undertaken by McDermott pursuant to Section 9 of the Builder's Risk policy which provided:

"It is further understood and agreed that the assured is authorized to carry out salvage and repairs necessitated by a loss which is covered by this policy. Such work shall be performed by the assured at their regular posted field prices for labor and equipment subject to final audit and approval by the assurers. In arriving at the final charges and allowance of not exceeding 24 hours shall be made prior to the actual commencement of salvage or repairs for rigging up time or delay due to heavy weather. In the event the assured is able to commence repairs in a lesser time, the actual time required only shall be charged. It is agreed that delay in the prosecution of such salvage or repairs caused by heavy weather, after commencement, shall not be deducted from the claim unless the weather is such that it becomes necessary for the equipment to leave the job site. Allowance shall be made by the assured from the time of leaving the job site until their return and re-arrival at job site."

39. On February 19, 1979, McDermott rendered an invoice to Adams & Porter in the amount of $1,395,295.67, representing the expense incurred during the salvage operation. The invoice covered all costs and expenses from October 19, 1975 to January 31, 1976.

40. Pennzoil submitted an invoice for costs and expenses incurred in connection with the salvage operation in the amount of $113,594.74.

41. Wright reviewed all invoices, bills, logs, and other documents and compared them with McDermott's published rates for labor and equipment.

42. By taking the total cost attributable to the salvage replacement of the damaged structure, and dividing it by the total number of hours involved in the operation, Wright arrived at a figure representing the average cost per hour.

43. Heavy weather became a significant factor during the salvage operation to the extent that it prevented McDermott from working on the platform for approximately 50% of the time. If weather was severe enough to require the DB–23 to pick up her spread of 8 anchors and move off location, the time she was absent from the platform was deducted from the claim. However, if weather conditions prevented work alongside the platform, but were not severe enough for the derrick barge to move off location, time continued to run and no deduction was made.

44. Daily reports submitted by McDermott, daily reports maintained by Pennzoil, the daily logs maintained by Turner and by DeWeese, and the daily log maintained on the DB–23 indicate the number of hours

each day that the DB–23 was either on location working, or off location on a storm anchor waiting for the weather to moderate. The logs make no reference to activity or work onboard the DB–23 while the barge was on her storm anchor waiting for weather to moderate.

45. Wright made a practical distinction between work time and weather time when the DB–23 was required to leave the location. If the barge picked up her spread of 8 mooring anchors and went to anchor on her storm anchor, the time counted as weather time. If the DB–23 remained on her anchor spread alongside the platform but moved away from the platform by adjusting the length of the anchor cables, the time she was not able to work because of the weather nevertheless was considered work time.

46. On June 9, 1976, Adams & Porter submitted the assured's claim with partial supports to underwriters. In the claim letter, the broker suggested that the surveyor had approved total amount of $1,405,536.60 less a deductible of $25,000. The letter incorrectly stated the surveyor's findings, in that he had noted the total claim, but had not made deductions from the amount claimed for time lost when heavy weather required the DB–23 to pick up its spread of anchors and move out of the area until the weather moderated.

47. The builders' risk policy was written by Adams & Porter who were aware of the heavy weather provisions in the Valuation Clause. Nevertheless, Adams & Porter made no comment with respect to the weather clause.

48. The time required to complete the salvage operations from 1940 hours on October 21, 1975, to 1200 hours on November 22, 1975, was 760 hours. Of this total number of hours, 380 hours represented work time, and 380 hours represented the time the DB–23 picked up her storm anchors and moved out of the area because of bad weather.

49. Upon receipt of the claim letter from Adams & Porter, underwriters reviewed the supporting documents and submitted a proposed adjustment on the basis of the policy terms and conditions, particularly Clause 9 which provided:

"This policy shall cover 100% interest in this insurance, but these assurers shall not be liable for more than the limits set forth and in no event shall the assurers be liable for more than their proportion of the cost of repairing or replacing the property damaged or lose with material of like kind and quality, plus contractor's profit. It is understood and agreed that contractor's profit is contained in and is a part of their regular posted field charges and that service performed shall be based upon said posted field charges . . ."

50. The proposed adjustment by underwriters contemplated replacement of the two pilings which were damaged as a result of being driven without driving shoes. The adjustment did not contemplate removal of the first two pilings and moving the platform to the new location.

51. The adjustment proposal was presented to Adams & Porter on January 31, 1977. It was subsequently rejected by McDermott and Pennzoil.

52. Suit was filed by McDermott and Pennzoil against the interested underwriters on October 18, 1977.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter under 28 U.S.C. § 1332.

2. The policy insured against "all risks of physical loss or damage from any cause" except as excluded in the policy. Under such a policy all losses are covered unless the insurer can prove the existence and applicability of a specific policy exclusion. Defendants presented no evidence of any policy exclusion.

3. The testimony clearly established that the crimping was accidental rather than deliberate and that there was no fraud involved. (Testimony of Barge Superintendents Hebert and LeGarde, Lawrence-Allison Project Engineer DeWeese, Pollock Engi-

neering Inspector Turner, and Pennzoil District and Division Engineer Whipple.) Significantly, Dr. Lee Lowery, Professor of Engineering at Texas A & M University and the pile driving expert called by defendants, testified that the pile failure could not have been predicted in advance.

4. Considerable evidence was presented regarding possible causes of the pile failure. Three different expert reports were introduced into evidence and suggested conflicting theories as to the causes of the crimping. Although the Court is unable to find, by a preponderance of the evidence, the actual cause of the crimping, it is likely that one or more of the following contributed to the pile collapse: (a) Composition of the subsoil at the level of refusal; (b) Failure to

replace the driving shoes; and (c) Method of using the hammers.[1]

5. Virtually every witness testified that the exact cause of the crimping can only be hypothesized and probably resulted from a combination of the foregoing factors. The testimony was also overwhelming that the crimping was unpredictable. Fortunately, the Court is not burdened with the task of determining the exact cause or causes.

6. Plaintiffs called and defendants accepted as an expert insurance witness Mr. Leslie Buglass, a distinguished author of numerous texts on marine insurance and one of the foremost authorities on the subject. Mr. Buglass was the only witness qualified at trial as an insurance expert.

---

[1]. (a) Composition of Subsoil at Level of Refusal.

Mr. DeWeese, the Lawrence-Allison Project Engineer employed by Pennzoil to oversee the installation, testified that he saw large rocks and coral ejected during jetting. It is possible that some hard subsurface obstructions interfered with the A–2 and B–3 pilings, contributing to the pile collapse.

(b) Failure to Replace the Drive Shoes.

The P–1 section of each piling had welded onto it a "drive shoe." This "shoe" was, simply stated, a five-foot section of thicker-walled pipe at the pile tip. (That is, while the P–1 section of each pile was 48 inches in diameter and $3/4$ inches thick, the first five feet were $1 1/4$ inches thick). The additional internal thickness of the shoe is the only difference between the shoe and the rest of the P–1 section.

Mr. Whipple testified that when he gave the barge instructions to cut off the 50-ft. sections, he assumed the driving shoes would be replaced prior to driving the remaining portions of the pilings. He testified that such had always been the practice in previous instances. Importantly, Pennzoil had no reason not to replace the shoes. Because a sufficient number of welders were on board, being paid, and unoccupied from the time the 50-ft. sections were cut until the pilings were stabbed into the jacket, replacement of the shoes would have been cost free to Pennzoil (testimony of Whipple, DeWeese and Turner). After the instructions to cut off the 50-ft. sections, Whipple recalled no discussions regarding the shoes until after the crimping had occurred, and he testified that if he had been asked, his instructions would have been to replace the shoes. The Court is unimpressed with the defendants' placement of importance on the failure to replace the shoes, however, because the Court finds that the alleged mishandling of the shoes and other equipment amounts to a finding of

negligence. During the course of the trial, defendants admitted and the Court finds that negligence is covered under this All Risks Policy.

(c) Method of Using the Hammers.

Mr. Whipple testified that he believed the crimping to have been the result of an excessively high blow count with the 3100 hammer while the pilings were at a shallow soil penetration. With each blow of the hammer, forces are exerted throughout the pile rather than exclusively at the pile tip. As the pile goes deeper below the surface, more and more of the force of the hammer is absorbed into the soil along the pile wall. At shallow penetration, there is an insufficient absorption of energy into the soil along the pile wall than at deeper penetrations. Thus, an undue amount of force is exerted at the pile tip. With or without a driving shoe, in Mr. Whipple's opinion, the cumulative effect of a higher number of blows per foot with the 3100 hammer at 105 or 111 feet of penetration caused the crimping.

Included in the method of using the hammer is the failure to jet prior to the crimping. Whipple testified that if the A–2 and B–3 pilings had been jetted prior to crimping, they could have been driven even without the driving shoes. Turner testified that he did not request authority to jet prior to the crimping. Whipple testified that if Turner had advised him of the difficulties experienced with driving the A–2 and B–3 pilings, he would have authorized jetting. Both Wayne Westerman and Dr. Lowery testified that jetting could have avoided the crimping.

Like failure to replace the driving shoes, however, the Court finds that failure to jet and improper use of the hammers are negligence which do not preclude coverage under the policy.

After Mr. Buglass sat through the trial, reviewed the relevant documents and heard the testimony, he testified that each of the three likely causes of the crimping (i. e., composition of the subsoil at the level of refusal, failure to replace the driving shoes, and method of using the hammers) was clearly covered under this All Risk Policy. More importantly, Mr. Buglass testified that the actual cause is irrelevant to the coverage question, since this All Risk Policy covers any accident regardless of its cause.

■ 7. An All Risk Policy creates a special type of coverage extending to every conceivable loss or damage, unless expressly excluded therein. *Essex House v. St. Paul Fire and Marine Insurance Co.*, 404 F.Supp. 978 (S.D.Ohio 1975). Recovery under an All Risk policy will be allowed for all losses not resulting from willful misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage. *C. H. Leavell and Co. v. Fireman's Fund Insurance Co.*, 372 F.2d 784 (9th Cir. 1977). Even if the loss results from negligence of the assured, there is coverage under an All Risk Policy. *C. H. Leavell and Co. v. Fireman's Fund Insurance, supra.* For the reasons stated above, the court concludes that the loss incurred was fortuitous.

8. The rule of construction requiring a contract of insurance to be construed against the insurer is one of the most familiar expressions in the reports of insurance cases. The rationale for such a rule is similar to the rule *contra proferentem*, a rule construing ambiguous or uncertain language most strongly against the party responsible for it. 1 *Couch on Insurance 2d* § 15:73.

9. The reason for a rule construing language in an insurance policy against the insurance company is that the company ordinarily prepares the wording of the policy. *C. H. Leavell & Co. v. Fireman's Fund Ins. Co.*, 372 F.2d 784, 789 (CA 9–1967). Where the meaning of a word employed is doubtful or uncertain, or where an ambiguity exists in policy terms, the assurer should not be allowed to benefit from a favorable construction of its own language.

10. Such a rule is consistent with both reason and logic. It is also consistent with the general rule of contract law that doubtful language is to be interpreted most strongly against the party who employed it in drafting the agreement. See, *e. g.*, 12 Am.Jur. 795, Contracts § 252; 17 Am.Jur.2d 688, Contracts § 276.

11. An insurance policy is a contract, and rules established for the interpretation of contracts are applicable to the interpretation of policies. *Calcasieu-Marine Nat. Bank of Lake Charles v. American Emp. Ins. Co.*, 533 F.2d 290 (CA 5–1977).

■ 12. But where the contract of insurance is prepared by the insured and its broker, and only presented to the underwriter for its acceptance, the reasons behind the rule of construction favoring the insured completely disappear. See *Travelers Indem. Co. v. United States*, 543 F.2d 71, 74–75 (CA 9–1976); *United States Shipping Board Merchants Fleet Corp. v. Aetna Cas. & Sur. Co.*, 98 F.2d 238, 241 (CA 2–1938); 13 *Appleman, Insurance Law and Practice*, § 7402, pp. 300–301 (1976 Ed.).

13. Indeed, a policy is not to be construed strictly against the insurer when the language in question was supplied by the insured or by his broker. *Travelers Indem. Co. v. United States, supra*, 543 F.2d at 74–75; *Marine Transit Corp. v. Northwestern F. & M. Ins. Co.*, 2 F.Supp. 489, 492 (E.D.N.Y.1933), mod. on other grounds 67 F.2d 544 (CA 2–1933). See, *Bay Trust Co. v. Agricultural Life Ins. Co.*, 279 Mich. 248, 271 N.W. 749, 750 (1937); *Sturgis Nat. Bank v. Maryland Cas. Co.*, 252 Mich. 426, 233 N.W. 367, 369 (1930); 13 *Appleman, Insurance Law and Practice, supra*, § 7402, pp. 300–01 (1976 Ed.).

14. In reviewing the policy in question, it is clear that the parties intended to exclude, not from coverage but from an adjustment of the loss, the costs incurred when, as a result of heavy weather, the assured's equipment is required to leave the job site. There can be no question that this was the intent of the parties.

15. "The cardinal rule of construction of insurance contracts is that the manifest intention of the parties should control." *Providence Washington Ins. Co. v. Stanley*, 403 F.2d 844, 849 (CA 5–1968).

16. This Court, being bound by the clear intent of the policy, must give the words chosen their plain, ordinary and unambiguous meaning. *Paul Revere Life Ins. Co. v. First Nat. Bank in Dallas*, 359 F.2d 641, 643 (CA 5, 1966); *Pendleton v. Aetna Life Ins. Co.*, 320 F.Supp. 425, 429 (D.C.La.1970); *Kansas City Fire & Marine Ins. Co. v. Clarke*, 217 F.Supp. 231, 235 (D.C.Mont. 1963), aff'd. 329 F.2d 647 (CA 9, 1964); *Sutro Bros. & Co. v. Idemnity Ins. Co. of North America*, 264 F.Supp. 273, 283–84 (D.C.N.Y.1967), aff'd. 386 F.2d 798 (CA 2, 1967); *First Continental Life & Accident Ins. Co. v. Hankins*, 480 S.W.2d 244, 249 (Tex.Civ.App.1972), error ref., n. r. e.; 13 *Appleman, supra*, § 7385; 1 *Couch on Insurance* 2d § 15:17.

17. Liability for weather delays after the assured's equipment has left the job site cannot be imposed on the assurers here, "where the policy explicitly and plainly exempts the insurers from liability" on this particular item of the claim. Cf. 13 *Appleman, Insurance Law and Practice, supra*, § 7403, pp. 328–29.

18. The construction and interpretation of the term "job site" should be a natural one. 13 *Appleman, Insurance Law and Practice, supra*, § 7386, pp. 138–43, § 7402, p. 270. "Of course, such construction must be reasonable and not such as to deprive the insurer of the benefit of an unambiguous provision placed in the contract for its protection." 13 *Appleman, supra*, § 7386, p. 153.

19. The term "job site" is not ambiguous, its meaning can be inferred quite easily. The term "site" implies the specific location of a building or structure, and the term "job", especially when considered in connection with the term "site", implies the specific location where work is being performed.

20. Consequently, when the assured's equipment was removed from the location of the platform and taken to a position where work could no longer be performed on the structure, the equipment had unquestionably left the job site.

21. Any other interpretation would require this Court "to read something into the contract which the parties have not put there". 13 *Appleman, supra*, § 7403, p. 330.

22. Construing the term "job site" as broadly as the assureds contend would place "one party to an insurance contract at the mercy of the other". 13 *Appleman, supra*, § 7386, p. 165. Such an interpretation should be avoided at all costs, and since the term "job site" was proposed by the assureds, it is only fair that they should be held responsible for the plain and ordinary meaning of the term. In any event, whatever uncertainties or ambiguities that might be raised, must be construed against the assureds.

23. In the alternative, the only question confronting this Court is the meaning of the term "job site" as that phrase is used in the policy's valuation provision.

24. The assureds, on one hand, contend that the term embraces an area in the Gulf of Mexico extending at least 2 to 3 miles from the location of the platform jacket. The assurers, on the other hand, contend that the assured's equipment leaves the job site whenever the derrick barge picks up her anchor spread and is towed a distance of at least two to three miles from the location of the platform.

25. The assurers base their contention on the nature of the assured's activity in removing the equipment. Whenever the weather situation deteriorates, the derrick barge and her entire supporting flotilla are towed to a distance of at least two miles away from the platform. The derrick barge is then secured on her storm anchor and would lay there until the weather subsides. The purpose, of course, in moving away from the platform is to assure that the derrick barge will not endanger the platform by swinging on her anchor cable.

26. The assurers further contend that the actions of the derrick barge and crew in stopping work, picking up the anchor spread, towing the equipment to a point at least 2 miles away, and there awaiting the opportunity to return to the platform and resume work, is clearly leaving the job site as that term is used in the policy.

27. The assureds, however, maintain that the boundaries of job site should not be drawn a mere 2 miles away. But it is not enough that the assureds differ with the meaning of the term "job site". There must be a reasonable basis for this difference of opinion. "The principle that ambiguous provisions in policies are to be construed against the insurer becomes applicable only when, after considering all the provisions of the policy, it is not possible for the court to ascertain the meaning of the language used when applied to the facts before the court." 13 *Appleman, supra* § 7403, p. 331.

28. This Court finds that the meaning placed upon the term "job site" by the assurers is the only common sense way to interpret the policy. The ordinary and common meaning of the term implies a close relation to the position of the building or job to be performed. The term "site" implies a precise or fixed position of a building or structure. *Webster's Third New International Dictionary* (1969 Ed.). Moreover, as *Webster's Third New International Dictionary* (1969 Ed.) defines the term "job", it means not only the performance or piece of work undertaken, but also the "object or material on which work is being done".

29. Assuming the provision in dispute is ambiguous, the assureds had every opportunity to present evidence as to what the term "job site" actually means in offshore construction parlance. But the only evidence presented from the assureds on this subject was from its insurance expert, Mr. Leslie Buglass, who frankly conceded that he was not familiar with offshore construction policies and that he had never before seen a valuation provision similar to the one in question.

30. Nevertheless, to avoid this plain meaning of the term "job site", the assureds contend that the policy provision was meant to apply only when the equipment was towed back to port. The simple answer to this contention is that the policy does not support such a construction.

31. Prior to the loss in question, the derrick barge and equipment were, in fact, towed to port because of an approaching tropical disturbance. Such action, however commendable in terms of safety and precaution, was done for the benefit of the derrick barge and crew. Other than to remove the equipment from the site of the platform, no further steps were taken to insure the platform's continued safety. It is the platform that was the subject matter of the insurance policy, not the derrick barge and her equipment.

32. Importantly, too, is that the policy itself does not say that the equipment must be towed to port before the heavy weather exclusion comes into effect. Had the assured intended this to be the case, it could have stated so in no uncertain terms.

33. In a further attempt to avoid the heavy weather exclusion, the assureds maintain that, even when the derrick barge was anchored 2 miles away from the platform, certain work was being performed in connection with the job at hand. Ignoring for the moment, that the assureds' own logs and records belie such a claim, the policy does not say that this is a determining circumstance. The provision merely states that delays in the salvage operations, whenever caused by heavy weather, shall be deducted when "it becomes necessary for the equipment to leave the job site". The operative event is the act of leaving the job site. Both common sense and the admission of assured's own employees compel the conclusion that removal of the equipment to a position 2 to 3 miles away from the platform is, in fact, leaving the "job site".

34. It must be remembered that the purpose of moving away from the platform's position was to avoid any possibility of coming into contact with the platform.

The mere fact that the derrick barge and crew were nevertheless ready and willing to return to work does not mean that assureds were still on the job site. Even if the equipment was towed back to port, where the assureds concede is clearly off the "job site", the equipment and crews would still be ready and willing to return to work.

35. When the assured's equipment leaves the job site, under the terms of this policy, it does not matter whether the equipment remains in the Gulf of Mexico or returns to port.

36. The policy provision does not affect coverage. It only limits the assured's responsibility for heavy weather delays, after commencement of salvage operations, when the assured's equipment leaves the job site. Any other interpretation would distort the obvious intentions of the parties to limit the assurers' liability for heavy weather delays during salvage operations.

37. The assured's expert witness on insurance matters was understood to say that a distance of at least 2 to 3 miles away from the platform *could* still be considered as part of the job site.

38. The important thing, however, is that the assured's expert believed that the term "job site" should be construed reasonably. But when asked where Mr. Buglass would draw the boundary of a job site, he could not offer any satisfactory insights.

39. When, as a result of heavy weather, the assured's equipment is removed from the site of the platform and towed to a position at least 2 miles away, where, of course, no work could be performed on the platform, it is entirely reasonable to say that the equipment has left the job site.

40. Significantly, too, is that the marine surveyor representing McDermott in this matter, Mr. J. Wright, reached this same conclusion when he was requested by the assured's broker to provide a breakdown of the weather delays. Without ever seeing the policy, and presumably acting on common sense alone, Wright drew a distinction between weather delays when the derrick barge remained alongside the platform and weather delays when the derrick barge picked up her anchor spread and moved 2 miles away. Wright, in his letter to the assured's broker, explained that the weather delays in moving the derrick barge away from the platform totalled approximately $650,000, but pointed out that this cost had not been deducted from the assured's claim. This letter, incidentally, was not forwarded to the assurers for use in adjusting the claim. Without this information, the assurers had no way of knowing whether the equipment had left the job site.

41. It is in light of this testimony that the Court finds as a matter of law, that the assured's equipment did leave the job site as that term was used in the policy.

42. This Court expressly rejects any attempt at finding an arbitrary boundary of the job site based on linear distance only. Rather, this Court finds that the actions of the assured in moving the equipment from the site of the platform, at least 2 miles, provides sufficient justification for concluding that the equipment left the job site.

43. There is considerable support for this conclusion in both the common and technical definition of the terms "job" and "site". This Court finds that the term job site means, quite simply, the site of a construction project. See *Dictionary of Architecture & Construction*. The term "site" is also defined as "the specific location of a building or buildings". *Dictionary of Architecture & Construction, supra.*

44. Defining the limits of a "site" in terms of offshore construction, though somewhat different from land-based construction, should not present any insurmountable problems. As defined in the *Dictionary of Mining, Mineral and Related Terms*, U.S. Department of the Interior, Bureau of Mines (1968), the term "site" is defined, in pertinent part, as "the location selected where a bore hole is to be drilled, engineering work to be conducted, or a structure erected. Also called location". Moreover, in the *Architectural & Building Trade Dictionary* (3rd Ed. 1974), the term site is simply defined as the "location of a building".

45. This Court accordingly finds that the term site should not be expansively defined. The term implies a specific location in the immediate vicinity of the platform's placement. Any attempt by this Court to say whether 2 miles, 5 miles, or even 15 miles away was still part of the job site would be arbitrary and futile.

46. Salvage operations were undertaken by McDermott on October 21 at 7:40 p. m. and concluded at noon on November 22. At the conclusion of the salvage operations, McDermott submitted an invoice for all costs incurred in the amount of $1,395,-295.67. The invoice covered the period from October 19, 1975, to November 22, 1975. The surveyor representing McDermott and underwriter's interests disallowed the sum of $104,000 as representing costs incurred between October 19, 1975 and October 21, 1975, before the salvage operations were commenced. During that period, work continued on the platform which became no relation to the salvage operations, i. e., during the A–4 and B–4 pilings, which in fact were removed to the salvage operations.

47. Additional expenses in the amount of $113,594.74 were incurred by Pennzoil during the salvage and repair operations. The policy was subject to a deductible of $25,000, thus the total amount incurred by McDermott & Pennzoil for restoration of the platform was $1,379,890.41.

48. From 1940 hours on October 21, 1975, until 1200 hours on November 22, 1975, when the piling was restored to its prior condition, a total of 760 hours elapsed. Dividing the total cost by 760 hours, the average hourly cost for the work accomplished was $1,815.65.

49. Of the 760 hours required to conduct the repairs, 380 hours represented actual working time or time when the derrick barge remained alongside the platform but was unable to work because of heavy weather; 380 hours represented time when because of severe weather the derrick barge was required to pick up her spread of anchors and move off location the distance of at least two miles to wait for the weather to moderate.

50. Using the actual working time of 380 hours and the average hourly rate of $1,815.65, the total amount recoverable under the policy for actual work time during salvage operations was $689,947.00.

51. The assureds in this matter have claimed the right to recover penalties and attorney's fees under the Louisiana statute, RS 22:658, penalizing an assurer for the failure to pay any claim due within sixty days after receipt of satisfactory proof of loss. This Court, however, is not convinced that Louisiana law applies or that the policy is, in fact, a Louisiana policy.

52. As pointed out by the assureds at trial, the policy in question is a marine policy covering, at least in part, certain marine risks in the construction and installation of an offshore platform. This Court accepts the assureds' characterization of the policy, but we must be guided accordingly.

53. A policy of marine insurance has always been considered as a maritime contract, partly because of the distinct flavor of the perils and risks insured, and partly because of the world-wide significance of marine insurance law as a "maritime subject *par excellence*". *Gilmore & Black, The Law of Admiralty,* pp. 49, 70 (1972 Ed.).

54. This raises the important question of what law governs. To this end we must be guided by the case of *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).

55. In *Wilburn,* the Court decided that there was no rule of federal origin or application defining the effects of warranties in marine insurance policies, and that, in the absence of such rule, the Court would not fashion one. The case was remanded to the lower court with directions to give effect to state statutes. See also *Gilmore & Black, supra,* pp. 48–49, 68–70.

56. The question of whether federal or local law applies to a marine insurance contract can present troublesome questions. Compare *Wilburn Boat Co. v. Fireman's Fund Ins. Co., supra,* 348 U.S. 310, with

*Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 852 (1961). See also *Irwin v. Eagle Star Ins. Co.*, 455 F.2d 827, 829–830 (CA 5, 1972).

57. Assuming that the question of penalties and attorney fees is governed by state law, since there is no well-settled applicable federal admiralty rule, under *Wilburn* we must look to federal choice of law rules in determining which state law to apply. *Navegacion Goya, S. A. v. Mutual Boiler & Machinery Ins. Co.*, 1972 AMC 650, 653 (S.D. N.Y.1972). See *Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257 (CA 5, 1976)

58. Under federal choice of law rules, we must apply the law of the state with the most significant relationships to the insurance contract. *Navegacion Goya, S. A. v. Mutual Boiler & Machinery Ins. Co., supra*, 1972 AMC at 653–54; *Restatement (Second) of Conflicts of Laws, Section 188*.

59. Here, the insurance contract was negotiated, issued and countersigned in the State of Texas. Pennzoil specifically requested that a new policy be issued. This new policy was issued and delivered to Pennzoil in Texas and to McDermott by and through its brokers also located in Texas. The testimony also revealed that premiums and additional assessments, if necessary, were to be paid by the assured's broker in Texas. Importantly, too, is that the assurers paid premium taxes to the State of Texas for these proceeds.

60. Indeed, under the blanket builder's contract between Pennzoil and McDermott, Pennzoil was to pay all costs of obtaining the insurance. Pennzoil, of course, has its principal place of business in Houston, Texas. Moreover, any payments received by the assurers, and upon which taxes were paid in Texas, were all made by the assured's brokers, Messrs. Adams & Porter, located in Houston, Texas.

61. Finally, the contract for construction and installation of the platform was to be performed in the offshore waters of Texas, and in this regard, Texas law would apply as the surrogate law of the platform. The Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331, *et seq.* See *Rodrigues v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

62. Under all these circumstances, Texas law should be applied.

63. Under the law of Texas, the right to recover penalties and attorney's fees is governed by the Texas Insurance Code, Vernon's Tex.St.Ann. Art. 3.62 and 3.62–1. By the terms of the statute, the right to recover penalties and attorney's fees applies only to life, health and accident policies. Tex.St. Ann. Art. 3.62 and 3.62–1. See, *Garfield Mut. Fire & Dorm. Ins. Co. v. Calhoun*, 532 S.W.2d 663, 667 (Tex.Civ.App.1976). The Code itself defines life, health and accident policies in Article 3.01, Vernon's Tex.St. Ann. It is made clear that the penalty statute is inapplicable to either marine or builders' risk policies.

64. This Court accordingly finds that the assureds are not entitled to recover penalties or attorney's fees.

65. Even assuming that the Louisiana conflicts of law rules apply, the result would be the same. In a diversity case brought in Louisiana, the Louisiana conflicts rule would apply the law of the place where the insurance policy was made. Here, significantly, the policy was made and delivered to both assureds in the State of Texas, either directly or through the assureds' broker.

66. Article 10 of the Louisiana Civil Code provides:

"The form and effect of private and public written instruments are governed by the laws and usages of the places where they are passed or executed.

"But the effect of acts passed in one country to have effect in another country is regulated by the laws of the country where such acts are to have effect . ."
L.S.A.–C.C. Art. 10.

67. The Louisiana Supreme Court has held that the validity and interpretation of insurance contracts and their provisions are to be governed by the law of the place

where made unless the parties express a contrary view. *Deane v. McGee*, 261 La. 686, 20 So.2d 669, 673 (1972). See also *Insurance Company of North America v. Davis*, 398 F.2d 418, 421 (CA 5, 1968).

68. Here, significantly, the contract of insurance was made and countersigned in the State of Texas, delivered to the assureds in the State of Texas, and the insurance provided therefor was intended to cover the construction of an offshore platform being installed in the Gulf of Mexico where Texas law would apply. It is clear that Texas law should govern in this instance.

69. This Court accordingly finds that penalties and attorney's fees are not to be recovered.

70. Judgment in accordance with the above Findings of Fact and Conclusions of Law will forthwith issue.